```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------------x

 3   MARCO MARTINEZ,

 4                   Plaintiff,

 5           -against-                    18 Civ. 4668(VB)

 6   PARAMOUNT COUNTRY CLUB LLC,

 7                   Defendant .

 8   -----------------------------------x

 9
                                United States Courthouse
10                              White Plains, New York

11                              September 12, 2019

12

13                   HONORABLE VINCENT BRICCETTI,
                             District Court Judge
14

15

16   KATZ MELINGER PLLC
             Attorneys for Plaintiff
17             280 Madison Avenue
             New York, New York 10016
18   BY:  KENNETH J. KATZ
         KATHERINE Y. MORALES
19
     WILSON ELSER MOSKOWITZ EDELEMAN & DICKER LLP
20             Attorneys for Defendant
             150 East 42nd Street
21             New York, New York 10017
     BY:  NANCY V. WRIGHT
22         JOANNA COLACURCIO

23

24

25
                     Angela O'Donnell, RPR, 914-390-4025
```

```
1                 THE CLERK:  All rise.

2                 THE COURT:  Good morning, everybody.

3                 THE CLERK:  In the matter of Marco Martinez against

4     Paramount Country Club LLC.

5                 Will counsel please note their appearance for the

6     record.

7                 MR. KATZ:  Kenneth Katz of Katz Melinger general for

8     the plaintiff.

9                 MS. MORALES:  Katherine Morales for.

10                MS. WRIGHT:  Nancy Wright, Wilson Elser for the

11    defendant.  Good morning.

12                MS. COLACURCIO:  Joanna Colacurcio, Wilson Elser for

13    the defendant.

14                ****

15                THE COURT:  This gentleman.  K. Bradley Black.

16                THE COURT:  Everybody prepared to go forward?

17                Mr. Katz.

18                MR. KATZ:  Yes, your Honor.

19                THE COURT:  Ms. Wright?

20                MS. WRIGHT:  Yes, your Honor.

21                THE COURT:  Of course, Mr. Martinez is the plaintiff

22    in this case, the motion is being made by the defendant to

23    compel arbitration but my understanding of the law here is that

24    once the defendant presents evidence of a contract and there's

25    certainly evidence of a contract to arbitrate, it becomes the
```

1  plaintiff's burden to show that there is no contract to

2  arbitrate.  So the plaintiff is going to go first in this case

3  and we'll take it from there.

4          Who are your witnesses, Mr. Katz?

5          MR. KATZ:  Just Mr. Martinez.

6          THE COURT:  Just Mr. Martinez.  And you have a

7  Court-certified interpreter.

8          MR. KATZ:  Yes, your Honor.

9          THE COURT:  Ms. Wright, who are your witnesses?

10         MS. WRIGHT:  I have three your Honor.  K. Bradley

11  Black, Ms. Wright, Susan Wright and also tar even KA ban, those

12  are the folks involved with the on boarding.

13         THE COURT:  No relationship between you and

14  Ms. Wright?

15         MS. WRIGHT:  No relationship.

16         THE COURT:  I mean, that's okay.

17         MS. WRIGHT:  None your Honor.  I forgot to mention

18  that.

19         MR. KATZ:  Is your microphone working?  Tap your

20  microphone, please.  Just tap it now.  There it is now. okay.

21         MS. WRIGHT:  Maybe it's my voice.

22         THE COURT:  For whatever reason it seemed not loud

23  newspaper.  Maybe it's me.  It probably is me, so that's what

24  happens when you get old.

25         All right.  Look, I know, really there's only one

```
 1    issue here, which is did he sign the agreement or not?  The
 2    broader legal issue is did he agree to arbitrate or not.  But
 3    in order to get there, we first have to decide whether he
 4    signed it.  My understanding is that the plaintiff says he
 5    didn't.  There's an E-signature that appears to be his.  But
 6    he's saying he did not cause that to be affixed to the
 7    agreement.  Right?  That's the gist of his position here.
 8              MR. KATZ:  Yes, your Honor.
 9              THE COURT:  And the defendants' position is, well,,
10    yes, it is.  There you go.  There's your factual issue.
11              There are other legal issues, because I know -- I
12    don't remember every detail, but I know that this company Oasis
13    came in at some point so, therefore, there's a question -- in
14    other words, they weren't there for the whole time.  Let me
15    start over again.
16              This company Oasis came in at some point and this
17    policy of having the employees sign arbitration agreements came
18    into effect once Oasis was there, but Mr. Martinez had been
19    working at the country club for some period of time beforehand.
20    So there are issues about whether even if he did agree to
21    arbitrate, does it cover the prior period of time?
22              Seems to me there was one other issue.
23              Oh, yeah.  The other sort of legal issue is whether
24    the defendant can enforce the agreement even though it was not
25    a signatory to the agreement.  But the trial today, the bench
```

1    trial today, is only with respect to the issue that I

2    identified earlier which is whether Mr. Martinez electronically

3    signed the agreement.

4              MR. KATZ:  Yes, your Honor.

5              THE COURT:  We all on the same page with that?

6              MR. KATZ:  Yes, your Honor.

7              MS. WRIGHT:  Absolutely, your Honor.

8              THE COURT:  All right.  I'm familiar with the general

9    facts and allegations in this case so I don't really feel the

10   need to have any kind of opening statement, but if you've

11   prepared for one and you would like to make a brief opening

12   statements, you'll welcome to do it.  You certainly do not have

13   to do it.

14             MR. KATZ:  I have no need to do one, your Honor.

15             THE COURT:  Ms. Wright?

16             MS. WRIGHT:  I don't like talking unnecessarily.  No,

17   your Honor.

18             THE COURT:  Okay, great.

19             Are there any witnesses in the courtroom that -- I

20   mean, in other words, witnesses other than the first witness

21   that are likely to be called?  We have Mr. Martinez is going to

22   be first.

23             Are any of your three witnesses here in the

24   courtroom?

25             MS. WRIGHT:  They're all here, your Honor.

1          THE COURT:  Well, do you want to invoke the rule of

2     sequestration?

3          MR. KATZ:  Yes.  I assume that Paramount's

4     representative gets to stay.

5          THE COURT:  You have to speak a little more clearly,

6     Mr. Katz.  Not your fault, but you do have you kind of swallow

7     your words a little bit and that's not good in this setting.

8     Just speak up, that's all.

9          MR. KATZ:  Yes, I would like all witnesses, other

10    than the representative of the company who's sitting at the

11    table, to be out of the room during testimony.

12         THE COURT:  I think that's the basic rule so I

13    thought one of your witnesses was testifying by video.

14         MS. WRIGHT:  Yes, your Honor, but because of the

15    related health issues, I managed to get all the information I

16    need with her colleague who is here.

17         THE COURT:  Oh, so there won't be any video?

18         MS. WRIGHT:  No, your Honor.

19         THE COURT:  Fair enough.

20         MS. WRIGHT:  Thank you.

21         THE COURT:  So the witnesses other than Mr. Beck, who

22    is effectively the client in this case, the other witnesses

23    will be excluded.

24         MS. WRIGHT:  Okay, your Honor.

25         THE COURT:  Not because we don't like them, but

1   because it's just a fair way to do this sort of thing.

2             All right?  Okay.  We ready to proceed.

3             MR. KATZ:  Yes, your Honor.

4             THE COURT:  All right then.  Why don't you call your

5   first witness?

6             MR. KATZ:  I call Mr. Martinez.

7             THE COURT:  Come on up, sir.  Sit there for a second.

8   I need my deputy to be here.

9             THE CLERK:  The interpreter is sworn.

10            Judge, so he does not need the oath.  He has an oath

11   on file.

12            THE COURT:  You have an oath on file, sir?

13            THE INTERPRETER:  Yes, sir.

14            THE COURT:  What is your name?

15            THE INTERPRETER:  Good morning.

16            My name is Victor G. Cruz, C-R-U-Z.

17            THE COURT:  Mr. Cruz.

18            THE INTERPRETER:  Yes.

19            THE COURT:  Welcome, Mr. Cruz.

20            THE INTERPRETER:  Thank you, your Honor.

21            (plaintiff Mamaroneck.

22    witness            , having been previously duly sworn,

23   testified further as follows:

24            THE CLERK:  Please be seated.

25            Please state your full name for the record, spelling

Martinez - direct (Katz)

1   your last name slowly.

2           THE WITNESS:  Marco Martinez Cabrera.

3           THE INTERPRETER:  Martinez, M-A-R-T-I-N-E-Z.

4   Cabrera, spelled C-A-B-R-E-R-A.

5           THE CLERK:  Thank you.

6           THE INTERPRETER:  You're welcome.

7           THE COURT:  Okay, you may proceed.

8           MR. KATZ:  Thank you, your Honor.

9           THE COURT:  Mr. Cruz, could you maybe step down to

10  the floor.  He'll hear from you there.  You don't need to be --

11  we don't really need you because we're not going to transcribe

12  what you say in Spanish.  The only thing you need to do is have

13  the witness be able to hear you and understand you, and I think

14  you can do that from there.

15          THE INTERPRETER:  Thank you.

16          THE COURT:  Go ahead, sir.

17  DIRECT EXAMINATION

18  BY MR. KATZ:

19  Q.   Good morning, Mr. Martinez.

20  A.   Good morning.

21  Q.   Approximately when did you start working for Paramount

22  Country Club?

23  A.   I began working at Paramount Country Club in 2014.

24  Q.   Did there come a time when Paramount Country Club changed

25  payroll companies?

Angela O'Donnell, RPR, 914-390-4025

Martinez - direct (Katz)

1    A.    Yes, sir.

2    Q.    Do you recall approximately when that was?

3    A.    In 2016.

4    Q.    Did there come a time when you had a meeting with the new

5    payroll company?

6    A.    Yes.

7    Q.    Do you know who you met with?

8    A.    Supposedly it was for a new company.  The company they

9    changed for a new company.

10   Q.    Where was the meeting?

11   A.    In a room, in a room at Paramount.

12   Q.    Were there any other employees from Paramount there?

13   A.    All the cooks.

14   Q.    What is your primary language?

15   A.    Spanish.

16   Q.    How long was this meeting, approximately?

17   A.    Around 20 minutes.

18   Q.    What language was the meeting conducted in?

19   A.    In English.

20   Q.    What did you understand from this meeting?

21   A.    Nothing.

22   Q.    After this meeting did there come a time you met with

23   Susan Wright?

24   A.    I did meet Susan, but it was many days afterwards.

25   Q.    And did you understand what the purpose of your meeting

Martinez - direct (Katz)

1   with Susan was for?

2   A.   That they were going to change the payroll.

3   Q.   Where was the meeting with Susan?

4   A.   In her office.

5   Q.   What language was Susan speaking to you in that meeting?

6   A.   English.

7   Q.   Was Susan at a computer during this meeting?

8            THE INTERPRETER:  Could you repeat that?

9   Q.   Was Susan at a computer during that meeting?

10  A.   Yes.

11  Q.   At any time during that meeting did you sit at that

12  computer?

13  A.   No.

14  Q.   At any time during that meeting did you sit at any

15  computer?

16  A.   No.

17  Q.   Does Susan have your personal information like your Social

18  Security number?

19  A.   All my identifications.

20           THE COURT:  Is the answer "yes" to that question?

21           THE WITNESS:  Yes.

22  BY MR. KATZ:

23  Q.   At any time during this meeting did you create an account

24  for Oasis Outsource Inc.?

25  A.   No.

Martinez - direct (Katz)

1  Q.   At any time during your employment with paramount did you

2  create an account with that Oasis Outsource Inc.?

3  A.   No.

4  Q.   At any time during this meeting did you create a password

5  for Oasis Outsource Inc.?

6  A.   No.

7  Q.   At any time during your employment with Paramount did you

8  create a password where Oasis Outsource Inc.?

9  A.   No.

10  Q.   At any time during this meeting did Susan ask you could

11  she create an account for you for Oasis Outsourcing Inc.?

12  A.   No.

13  Q.   At any time during this meeting did Susan ask you to

14  create, if she could create a password for you for Oasis

15  Outsourcing Inc.?

16        THE INTERPRETER:  Could you repeat the question,

17  please?

18  Q.   At any time during this meeting did Susan ask you could

19  she create a password for you for Oasis Outsourcing Inc.?

20  A.   No.

21        THE COURT:  At any time during this meeting did you

22  review the computer screen to see what was on the computer

23  screen.

24  A.   No.

25  Q.   At any time during this meeting did Susan ask you to

Martinez - direct (Katz)

1    review the computer screen?

2    A.    No.

3    Q.    When was the first time you became aware that Paramount

4    claimed you signed an arbitration agreement?

5    A.    I knew through my attorneys who showed me the paper.

6    Q.    In terms of timeframe was that after this lawsuit was

7    filed?

8              MS. WRIGHT:  Objection.

9              THE COURT:  Hold up.

10             MS. WRIGHT:  Just objection to the form.  Leading.

11             THE COURT:  Well, it is leading.  You've asked a lot

12   of leading questions to which you did not object.

13             I'm going to allow it.  But this is your client.  I

14   know that he's testifying through an interpreter, but to the

15   extent possible, you should avoid leading.

16             So the question was:  He said, "I knew through my

17   attorneys who showed me the paper."

18             That was in response to the question, "When was the

19   first time you became aware of this?"

20             And then the next question was:  "Was that after this

21   lawsuit was filed?"

22             So the question is, when you first learned about the

23   arbitration agreement, because your lawyer showed it to you,

24   was that after this lawsuit was filed?

25             THE WITNESS:  Yes.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   BY MR. KATZ:

2   Q.   Was there ever a time that you authorized anyone from

3   Paramount Country Club LLC to sign an arbitration agreement on

4   your behalf?

5   A.   No.

6   Q.   Was there ever a time that you authorized anyone from

7   Oasis Outsourcing Inc., to sign an arbitration agreement on

8   your behalf?

9   A.   No.

10          MR. KATZ:  I have no further questions, your Honor.

11          THE COURT:  Any cross?

12          MS. WRIGHT:  Yes, your Honor.

13   CROSS EXAMINATION

14   BY MS. WRIGHT:

15   Q.   Good morning, Mr. Martinez.

16   A.   Good morning.

17   Q.   You testified earlier that you first had a meeting with

18   the new payroll company; correct?  Oasis?

19   A.   Yes.

20   Q.   And you indicated that at that meeting where you indicated

21   all the cooks were present it lasted for about 20 minutes?

22   A.   Yes.

23   Q.   Where did the meeting occur?

24   A.   At the room at Paramount.

25          THE COURT:  One second.  Did he just answer that

Martinez - cross (Wright)

1  question in English?  When he just said at the room at

2  Paramount was that in English or Spanish.

3          THE INTERPRETER:  No, he answer it in Spanish, if he

4  used the word, your Honor, room, probably that's the only word

5  in English that he just didn't answer.

6          THE COURT:  Fair enough.  Next question.

7  BY MS. WRIGHT:

8  Q.   Which room in Paramount is that the same room Susan's

9  office was in?

10  A.   No.

11  Q.   Okay.  Where in relation to the room that you met with the

12  Oasis folks was Susanne's office?

13  A.   Susan's office is on one location and the room where the

14  meeting was held is the room used for buffets.

15  Q.   How far from that room is Susanne's office?  If you want

16  to use feet or something else.

17  A.   Susan's office is located on the first floor where the

18  room where the meeting was held is on the second floor.

19  Q.   What day did you meet with the payroll company?

20  A.   (In English)  Day.  I don't remember the date.

21          THE COURT:  Let me just state for the record.  That

22  was definitely English.  Because I don't speak Spanish, he

23  said, "I don't remember the date," in English.  I think that

24  needs to be stated for the record.

25          So you don't remember the date?

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1            THE WITNESS:  I do not remember the date.

2    BY MS. WRIGHT:

3    Q.   Do you recall what month?

4    A.   I do not remember the month but I do remember the year.

5    Q.   What year?

6    A.   '16.

7    Q.   2016?

8    A.   2016.

9    Q.   And you indicated that your meeting with Susanne happened,

10   in your words, many days afterwards; correct?  I'm sorry.

11   Susan.

12   A.   Yes.

13   Q.   Do you recall what day you met with Susan?

14   A.   I do not remember the date.

15   Q.   How long after the meeting with Oasis was your meeting

16   with Susan?

17   A.   I do not remember.

18   Q.   Was it more than a week later?

19   A.   Yes.

20   Q.   More than two weeks later?

21   A.   More or less.

22   Q.   Okay.  And that was the date that you met with Susan where

23   you claim she filled out your paperwork for the payroll.

24            MR. KATZ:  Objection.  That's a --

25            THE COURT:  Hold on.

Martinez - cross (Wright)

1           Mr. Cruz, when you hear "objection," just wait for me

2     to rule on it.

3           MR. KATZ:  The objection is --

4           THE COURT:  Hold on one second.

5           THE COURT:  Just rephrase the question.  Let's start

6     over again.

7           MS. WRIGHT:  Sure.

8     BY MS. WRIGHT:

9     Q.   And when you eventually met with Susanne, whatever the

10    date was, was the date you had indicated that she filled out

11    information for you on the computer?

12          MR. KATZ:  Objection.  The testimony wasn't that

13    Susan filled anything out.

14          THE COURT:  Well, there's -- his testimony on direct

15    was when he met with Susan -- and you can translate this -- his

16    testimony on direct was that when he met with Susan she was

17    sitting at a computer but he was not.

18          THE WITNESS:  No.

19          THE COURT:  That's not a question.  That's just me

20    speaking right now.

21          I don't think he ever -- I think Mr. Katz is right, I

22    don't think he ever testified that Ms. Wright filled out

23    information on the computer.  Maybe she did, maybe she didn't,

24    but he didn't so testify.  You can ask whether she did.  In

25    other words, you need to rephrase the question.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          MS. WRIGHT:  Sure.

2          THE COURT:  Something along the lines of:  When she

3     was sitting at the computer and you were not sitting at the

4     computer.  What was she doing.  What were you doing what did

5     you understand she was doing, that kind of thing.

6     BY MS. WRIGHT:

7     Q.   When you met with Susan and she was sitting at the

8     computer, what was she doing?

9     A.   Writing on the computer.

10    Q.   Do you know what she was writing?

11    A.   Supposedly all my information.

12    Q.   When you say supposedly all your information, what are you

13    basing that on?

14         Did you see what she was writing?

15    A.   I cannot read English.

16    Q.   My question is did you see what she was writing?

17    A.   I didn't see what she was writing.  I see her writing.

18    Q.   You indicated earlier that she was writing your

19    information.  How do you know that that's what she was writing?

20    A.   Because I was the one who was with her.

21    Q.   At any point during your meeting with Susan did she tell

22    you that she was writing or entering your information?

23    A.   No.

24    Q.   Okay.  During your meeting with Susan, did you see her

25    print out or did she show you any document which contained your

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   information?

2   A.   No.

3   Q.   You indicated that you don't -- you can't read English;

4   correct?

5   A.   That's correct.

6   Q.   So you have no idea what she was inputting on that

7   computer on that date; correct?

8   A.   No.

9   Q.   Do you recall --

10          THE COURT:  No what?  No, no, that's a double

11   negative.

12          MS. WRIGHT:  Okay.

13          THE COURT:  You need to -- did you have any idea as

14   to what she was inputting on that computer?

15          THE WITNESS:  All my information.

16          THE COURT:  How do you know that?

17          MS. WRIGHT:  Exactly.

18          THE WITNESS:  Because all the employees had already

19   gone there.

20   BY MS. WRIGHT:

21   Q.   I'm not sure I understand you.  What do you mean all the

22   employees had already gone there?

23   A.   All the employees from the kitchen, the kitchen employees,

24   all of them have already gone.

25   Q.   Had already gone where?

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   A.   To enter all -- to put all their information.

2   Q.   Put all their information with who?

3   A.   With Susan.

4   Q.   How do you know this?

5   A.   Because I was sent to her.

6   Q.   Did anybody tell you that they had gone to SusanneSusan

7   for her to enter their information?

8   A.   No.

9   Q.   Did you see at any point any of your information on the

10  screen that she was entering?

11  A.   No.

12  Q.   So at any point did Susanne say to you she was entering

13  your information on the computer?

14  A.   No.

15  Q.   Does Susanne speak Spanish?

16  A.   No.

17  Q.   The entire time you were meeting with Susan, did you have

18  any conversation with her?

19  A.   No.

20  Q.   Okay.  Do you recall be submitting --

21           THE COURT:  Hold on.  Wait a second.

22           MS. WRIGHT:  I'm sorry.

23           THE COURT:  You sat in her office; is that correct?

24           THE WITNESS:  Correct.

25           THE COURT:  While you were in her office did you

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1    speak?

2              Did you open your mouth and speak?

3              THE WITNESS:  Okay.  I arrived there.  I understand

4    what is said in the kitchen.  I understand all of that what is

5    said in English.  Anything kitchen related, anything vegetable,

6    food related I understand.

7              THE COURT:  Okay that wasn't my question.  My

8    question is -- it's actually Ms. Wright's question -- my

9    question is did you have any conversation with Susan right in

10   her office on that day in any language?

11             THE WITNESS:  Yes.

12             THE COURT:  What language?

13             THE WITNESS:  My English is limited.

14             THE COURT:  You understand that's your testimony

15   that's not my question.

16             THE WITNESS:  It's really, sir, half and half.

17             THE COURT:  Okay that's all I'm asking.

18             THE WITNESS:  Okay.

19             THE COURT:  Just answer my question, that's all.

20   Let's try one more time.  Well maybe not.  You're saying you

21   did speak to her is that correct.

22             THE WITNESS:  Correct.

23             THE COURT:  Half in English, half in Spanish?

24             THE WITNESS:  Yes, combine them both.

25

Martinez - cross (Wright)

1    BY MS. WRIGHT:

2    Q.   What was your conversation about when you spoke with her?

3              MS. WRIGHT:  May I note for the record the witness

4    responded before --

5              THE COURT:  Just say again Ms. Wright

6              MS. WRIGHT:  May I note for the record that the

7    witness responded before the translation was completed.

8              THE COURT:  My question to you was did he respond in

9    English or respond in Spanish?

10             MS. WRIGHT:  He responded in Spanish.

11             THE COURT:  What you're saying is you asked a

12   question in English.

13             MS. WRIGHT:  Yes, your Honor.

14             THE COURT:  Before it was translated into Spanish, he

15   responded in Spanish.

16             MS. WRIGHT:  Yes, your Honor.

17             THE COURT:  The reason you're making that note

18   because it suggests he understands English.

19             MS. WRIGHT:  Yes, your Honor.

20             THE COURT:  And also Spanish.

21             MS. WRIGHT:  Yes, your Honor

22             THE COURT:  Okay I understand that.  Proceed.

23   BY MS. WRIGHT:

24   Q.   Do you recall submitting documents a declaration where you

25   indicated that your meeting with Susan took place on

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   September 26, 2016?

2   A.   I wasn't given any copies.

3   Q.   That is not my --

4          THE COURT:  I suspect you're going to be given one

5   now.

6          Do you have this document you're referring to?

7          MS. WRIGHT:  It's Exhibit A, your Honor, and it's the

8   declaration.  I can give you a copy to opposing counsel.  I'm

9   sorry, not Exhibit A.  Where is it?  Oh, it's the declaration,

10  I didn't have it as an exhibit, but I can walk it up to you

11  now?

12         THE COURT:  Yes, I don't have that.

13         MS. WRIGHT:  It was attached to the motions but I

14  will bring it up now.

15         THE COURT:  Wait a second, Ms. Wright.  Hold on a

16  second.  Let's just find this document.  This is a declaration

17  that Mr. Martinez signed as part of the motion papers that were

18  filed, is that what you're saying?

19         MS. WRIGHT:  Your Honor, it was submitted by his

20  attorney on the motion.

21         THE COURT:  Fair enough.  I have it.

22         MS. WRIGHT:  Okay.  I have a copy.

23         THE COURT:  Hold on one second.  Hold on.

24         MS. WRIGHT:  Okay.

25         THE COURT:  Do you want Mr. Martinez to see this?

Martinez - cross (Wright)

1            MS. WRIGHT:  Sure, your Honor, I can show it to him.

2            THE COURT:  He can see my copy because I've got an

3       extra copy.

4            MR. KATZ:  Just for a clarification, is that the

5       Spanish version?

6            THE COURT:  Both.  Well, what I just handed him was

7       in English and then it has a certificate of translation and

8       then it's in Spanish and the signature is on the Spanish

9       version, in other words, in other words an English version with

10      a signature blank followed by a certificate of translation into

11      Spanish followed by I I assume the correct translation into

12      Spanish and that's the portion of the document that's signed

13      are we talking about the same document, Ms. Wright.

14           MS. WRIGHT:  Yes, your Honor.

15           THE COURT:  And it bears a date of 26 October 2018;

16      is that right?

17           MS. WRIGHT:  Yes, your Honor.

18           THE COURT:  Okay.  Go ahead.  I assume you have this.

19           MR. KATZ:  I want to make sure my client got a

20      Spanish version of it.

21           THE COURT:  Both English and Spanish.  Ask your

22      question, Ms. Wright.

23      BY MS. WRIGHT:

24      Q.   Take a moment to look at the document and when you're on

25      done let me know, Mr. Martinez.

                    Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          THE COURT:  It's pretty long, why don't you point him

2     to paragraph three.

3          MS. WRIGHT:  Sure, it's paragraph three.

4          THE COURT:  Paragraph three of the Spanish version.

5     Go ahead ask your question.

6     Q.   Do you see in paragraph three your meeting with Susan

7     occurred on or about September 2016?  (september 26, 2016)?

8     A.   Yes.

9     BY THE COURT:

10    Q.   Does that refresh your recollection now as to when you met

11    with her?  (that was question)?

12    A.   I do not remember the date but here it is.

13    Q.   Right below that paragraph four where it says that your

14    meeting with Susan was brief, was very brief and was conducted

15    completely in English, do you see that?

16    A.   Yes.

17    Q.   But you're testifying now it was half English, half

18    Spanish that the conversation was conducted in?

19    A.   It was I speaking.

20    Q.   What were you saying during the meeting?

21    A.   I do not remember.

22    Q.   What were you talking about during the meeting?

23    A.   If she asked me any questions I answered them in both

24    languages.  Because I can't speak English well, a little.

25         THE COURT:  Okay that wasn't the question.  The

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   question was:  What were you talking about during the meeting,

2   is that the question Ms. Wright.

3            MS. WRIGHT:  Yes, your Honor.

4            THE WITNESS:  Not that we were talking.  She ask any

5   questions I answered them in both language, English and

6   Spanish.

7            THE COURT:  But what was the subject matter?  Let me

8   ask a different question.

9            Were you talking about baseball?

10           THE WITNESS:  No.

11           THE COURT:  Were you talking about the weather?

12           THE WITNESS:  No.

13           THE COURT:  Were you tacking about golf?

14           THE WITNESS:  We're not supposed to.

15           THE COURT:  The answer is no, you were not talking

16   about golf?

17           THE WITNESS:  No.

18           THE COURT:  Were you talking about food?

19           THE WITNESS:  No.

20           THE COURT:  What were you talking about?

21           THE WITNESS:  If we talk it was about the papers that

22   I was filling out.

23           THE COURT:  You talked about the papers that you were

24   filling out?

25           THE WITNESS:  Supposedly the ones that she was

Martinez - cross (Wright)

1    entering in the computer.

2              THE COURT:  But the question is do you remember what

3    it is that you talked about?

4              THE WITNESS:  No.

5              THE COURT:  Okay next question.

6    BY MS. WRIGHT:

7    Q.   Did she ask you for any personal information during that

8    meeting?

9    A.   I don't remember.

10   Q.   Do you recall anything at all that you said to her during

11   that meeting?

12   A.   Yes.

13   Q.   What do you recall?

14   A.   I have only a short time because they are waiting for me

15   in the kitchen.

16             THE COURT:  Okay, Mr. Martinez, you know that I'm the

17   judge in your case; right.

18   A.   Yes, sir.

19             THE COURT:  And I'm going to be making important

20   decisions about your case, you know that?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  And do you know that part of the basis

23   for those decisions is whether I think you're telling the truth

24   or not?

25             THE WITNESS:  Yes, sir.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1           THE COURT:  And I'm telling you that part of my

2     evaluation of whether you're telling the truth or not is

3     whether you answer questions directly asked by the lawyers or

4     whether you're being evasive in answering those questions.

5           THE WITNESS:  Evasive?

6           THE COURT:  Do you understand that that's part of my

7     decision about whether you're answering questions directly or

8     whether you're not answering questions directly.

9           THE WITNESS:  What should I say, yes or no?

10          THE COURT:  I don't know.  Just answer.

11          THE WITNESS:  I don't understand very well.

12          THE COURT:  Do you understand, let me just tell you I

13    need to decide whether I think you're being truthful.  That's

14    my job.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Part of that determination is whether I

17    think you're being -- you're answering questions directly or

18    whether you're not AEPBTSing questions directly that's part of

19    what I do, my job.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  You need to answer questions directly.

22          THE WITNESS:  EUFRPBLGS okay.

23          THE COURT:  Ask that question again.

24          MS. WRIGHT:  I don't remember what I asked would you

25    plead read back my question.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          THE COURT:  Do you have the last question.  (question

2    the read and interpreted by interpreter).

3    A.    That I had to go back to the kitchen because they were

4    waiting for me.

5    Q.    Is that something that you told Susan?

6    A.    Yes.

7    Q.    In English or Spanish?

8    A.    In Spanish.

9    Q.    Did she understand you?

10   A.    She understands a lot of Spanish but do not speak a lot.

11   Q.    You're saying Susan understands a lot of Spanish?

12   A.    A lot.

13   Q.    Did she tell you this?

14   A.    We talk in the kitchen because I was the one who cooked

15   for the employees.

16   Q.    Did Susanne tell you this?

17   A.    I heard her.

18   Q.    When did you hear her?

19   A.    All the time in my kitchen.

20   Q.    You hear her speaking Spanish in your kitchen?

21   A.    None of the employees in the kitchen spoke English, all of

22   them spoke Spanish.

23          THE COURT:  You really don't -- you have trouble

24   answering questions directly and that troubles me.  Okay?

25          THE WITNESS:  I understand.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1           THE COURT:  The question was:  Did you hear her

2   speaking Spanish in your kitchen?

3           THE WITNESS:  Yes.

4   BY MS. WRIGHT:

5   Q.   Okay, do you recall submitting in this declaration

6   paragraph five that Susan spoke to you completely in English

7   during the pleating because she does not speak Spanish?  Do you

8   see that?

9   A.   She understands English.  I mean she understands a lot of

10  Spanish and she does speak Spanish.

11          THE COURT:  Okay, Mr. Martinez, do you see in

12  paragraph five where it says -- this is your declaration, do

13  you have it there, paragraph five?  Do you see where it says

14  she does not speak Spanish?  You see that?

15          THE WITNESS:  Yes.

16          THE COURT:  So you said under oath in your

17  declaration that she does not speak Spanish; is that correct?

18          THE WITNESS:  She doesn't speak Spanish but in the

19  kitchen it has to do with vegetables, with food, you know?

20  That's the reason I say that she speaks Spanish.  But in the

21  office she never speaks Spanish.

22          MS. WRIGHT:  Okay.

23          THE COURT:  Okay.  Next question.

24  BY MS. WRIGHT:

25  Q.   Turn to number 11 on that declaration.  The last sentence

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1  where it says that you did not see the contents of her computer

2  screen during the entirety of your meeting; do you see that?

3  A.   Yes.

4  Q.   So you have no idea what she was filling out or inputting

5  on that computer that day; correct?

6  A.   She never asked me for any information and I never ask her

7  anything.

8  Q.   Okay I'm going to repeat my question.  You have no idea

9  what she was filling out on that computer that day; correct?

10 A.   No.

11          THE COURT:  It's not correct?

12          THE COURT:  You've got to do a better job.

13          MS. WRIGHT:  I have to do a better question.

14 Absolutely.

15 BY MS. WRIGHT:

16 Q.   Do you know what she was filling out on the computer on

17 that day on that meeting?

18 A.   I didn't know.

19 Q.   Okay.  At no time during the meeting did you see her show

20 you any form is your testimony; correct?

21 A.   No.

22 Q.   So you did not see?

23          THE COURT:  Don't you understand, Ms. Wright.

24          MS. WRIGHT:  You can't talk when I'm talking.

25          MS. WRIGHT:  Sorry your Honor.

Martinez - cross (Wright)

1              THE COURT:  You cannot ask questions when the answer

2    is a double negative and then move on as if you got the answer

3    you wanted, I mean the question was at no time did you see her

4    show you any form, is that your testimony?  No.

5              That means she did show him forms and he did see the

6    forms but I don't think that's what you think he means.

7              MS. WRIGHT:  No, your Honor.

8              THE COURT:  You're making a record here, you see I've

9    got a record, right?  What you think is fine, but that's not

10   what it is in the record.  In the record it says, yeah, she

11   showed me the forms all right and I knew what she was doing.

12             MS. WRIGHT:  Okay.

13             THE COURT:  But I don't think that's what you're

14   trying to accomplish here and I'd like the record to be clear.

15             MS. WRIGHT:  Absolutely.

16             THE COURT:  Let's try to do that.

17             MS. WRIGHT:  Absolutely.

18             THE COURT:  Let's try to ask questions designed to

19   clarify not OB few skate.

20             MS. WRIGHT:  I will rephrase the question.

21   BY MS. WRIGHT:

22   Q.   Atfully time during your pleating with Susanne, did you

23   see any of the forms she was filling out on the computer?

24   A.   No.

25   Q.   Back to your declaration par TKPWRAOEUF, you indicate your

Martinez - cross (Wright)

1   edge HREURB is very limited do you see that?

2   A.   That's correct.

3   Q.   During your employment at Paramount, you filled out forms

4   that were in English; do you recall?

5   A.   Never.

6   Q.   You've never, just to clarify you've never put information

7   on any form during the entire time that you were hired by

8   Paramount on forms that were in English?

9   A.   With someone who told me what I had to fill out.

10         MS. WRIGHT:  At this point, your Honor, I want to

11   pull from the exhibits and I want to make sure that counsel has

12   a copy, exhibit B which is a W four.

13         THE COURT:  Now this is an exhibit that's A, B, C, D.

14   They're KPEUPBTS just for the trial or are they exhibits to the

15   motion where are those exactly?

16         MS. WRIGHT:  These were documents that we exchanged

17   in advance of this bench trial that we were going to utilize

18   today.

19         THE COURT:  So these are trial exhibits.

20         MS. WRIGHT:  Yes, your Honor.

21         THE COURT:  And I have exhibits A through F.

22         MS. WRIGHT:  I will not use all of them.

23         THE COURT:  All right.  So now that was right).

24         THE COURT:  Right now you're using exhibit B.

25         MS. WRIGHT:  Yes, your Honor.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          THE COURT:  You want to show it to him.  Does he have

2    it?  Could you land it up please so the witness has it?

3          Turn to exhibit B, please.  B as in boy.  Okay what's

4    your question.

5    BY MS. WRIGHT:

6    Q.   Take a look at that document, sir, is any portion of the

7    handwritten sections in your handwriting?

8    A.   In my handwriting my signature and the date.

9    Q.   So all the handwritten portions at the very bottom of that

10   first page under employee withholding allowance certificate,

11   are you saying that that's all your handwriting?

12         MR. KATZ:  Objection that's not what he just

13   testified to.

14         THE COURT:  Well, okay.  But again you could ask the

15   question better.

16         MS. WRIGHT:  Okay.

17         THE COURT:  What about the handwriting where it's

18   printed Marco C Martinez and then there's a Social Security

19   number is that your handwriting (In English) that's not my

20   handwriting.

21         THE COURT:  Mr. Martinez help me out here, wait for

22   it to be translate if you want me to think you don't speak

23   English it would be better for you to be brutally honest.  You

24   see where it says Marco C Martinez with a Social Security

25   number printed out?  Whose handwriting is that?

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

 1                THE WITNESS:  I don't remember who filled it out.

 2                THE COURT:  Is it your handwriting?

 3                THE WITNESS:  The signature and the date, that's my

 4     handwriting.  And the numbers there.

 5                THE COURT:  And the other handwriting is not your

 6     handwriting is that that what you're saying?

 7                THE WITNESS:  Yes.

 8                THE COURT:  Okay, thank you.  Next question.

 9                MS. WRIGHT:  Sure.

10     BY MS. WRIGHT:

11     Q.   Do you know whose handwriting it is writ says Marco C

12     Martinez?

13     A.   I don't remember whose it is, I don't remember who wrote

14     it, I don't remember who helped me out.

15     Q.   You're saying someone helped you?

16     A.   All I remember all I know that that's my signature.

17     Q.   My question is you're saying someone helped you fill this

18     out.

19     A.   Someone always help me.

20     Q.   Do you recall who in this particular situation?

21     A.   No, I do not remember.

22     Q.   Did the person speak Spanish who assisted you?

23     A.   Supposedly, yes.

24     Q.   What does that mean, supposedly yes do you know if the

25     person spoke Spanish or not?

                        Martinez - cross (Wright)

1   A.   Because since I speak Spanish, I always look for someone

2   who spoke English.

3   Q.   And you don't recall who it was specifically who you

4   looked for who helped you on this occasion you filled this form

5   out?

6   A.   **** ATTENZIONE.

7   A.   I do not remember.

8   Q.   Is it always the same person you asked for help with

9   forms?

10          THE COURT:   This particular form, I'm still a little

11  unclear about this.   The person who helped you, I'm asking

12  about the person who helped you did that person help you in

13  Spanish?   In other words the person explained the form to you

14  in Spanish or read it to you in Spanish?

15          THE WITNESS:   If he read the document?

16          THE COURT:   You said a person helped you; correct?

17          THE WITNESS:   Okay, yes.

18          THE COURT:   Did he help you in Spanish or did he help

19  you in English?   How did he help you what language?

20          THE WITNESS:   I look for help for -- to fill out.   I

21  then they would always tell me sign here.

22          THE COURT:   That wasn't my question.   Please answer

23  my question.   My question is when the person helped you with

24  this did he speak Spanish to you about it when he was helping

25  you or did he speak English when he was helping you?

                  Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1              THE WITNESS:  In Spanish.

2              THE COURT:  He helped you in Spanish?

3              THE WITNESS:  Yes.

4              MS. WRIGHT:  Okay.

5              THE COURT:  Did the person, withdrawn.  Is that your

6  signature there almost TPHRAOER the bottom of the form, do you

7  see that?

8              THE WITNESS:  Yes.  It is ply signature.

9              THE COURT:  And right above it there's some words in

10  English which start out "under penalties of perjury" and

11  there's some additional English there, you see that?

12             THE INTERPRETER:  Your Honor he's asking --

13             THE COURT:  Where it says under penalties of perjury,

14  can you point that out to him, please?  You see that?  The.

15  A.   I am looking at them but I cannot read them.

16             THE COURT:  That's not my question, I'm asking you,

17  do you see those words there, right THR-FPL you see that now?

18  Do you see it?  You can see, right?

19             THE WITNESS:  Not very well.  I need glasses.  The

20  print is very small.

21             THE COURT:  Go ahead.

22  BY MS. WRIGHT:

23  Q.   When you were filling out this particular form, did

24  whoever was helping you explain that you were filling out the

25  information and certifying that it was accurate under penalties

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1  of perjury?

2  A.   I don't remember.

3  Q.   The date you signed the document is February 19, 2014; do

4  you recall that that was your first day of employment?

5  A.   I don't remember.

6  Q.   Would you turn to the next document in the batch which is

7  exhibit C, please.

8         THE COURT:  Are you offering exhibit B into evidence.

9         MS. WRIGHT:  Your Honor at this time I move to offer

10  exhibit B into evidence.

11         THE COURT:  Any objection?

12         MR. KATZ:  No objection.

13         THE COURT:  B is received.

14         (Party         Exhibit      received in evidence).

15         THE COURT:  Before you go on to exhibit C I just have

16  a couple of questions about that pleating with Ms. Wright.  The

17  meeting you had with Ms. Wright which you said in your

18  declaration was on or around September 26th, 2016; do you

19  remember what day of the week that was?

20  A.   I don't remember.

21         THE COURT:  Is the country club open on Mondays?

22         THE WITNESS:  Seven days.

23         THE COURT:  So there are golfers there that play golf

24  on Mondays?

25         THE WITNESS:  Well it was always on Mondays, some of

Martinez - cross (Wright)

1    the people who went to play and they were there and I was in

2    the kitchen, we were always there, open.

3              THE COURT:  But was Monday a busy day at the country

4    club?  Not all.

5              THE COURT:  Not what?

6              THE WITNESS:  Not all.

7              THE COURT:  Well Saturday and Sunday are very busy am

8    I correct?

9              THE WITNESS:  Friday, Saturday and Sunday.

10             THE COURT:  What about Monday?

11             THE WITNESS:  Monday there are parties the employees,

12   there are parties for all the people, the people who play golf.

13             THE COURT:  All right.  Anyway, continue, you wanted

14   him to look at exhibit C.

15             MS. WRIGHT:  Yes, your Honor.  Before I do that, at

16   this point also, your Honor, I want to move to offer the

17   declaration both the English and the Spanish version into

18   evidence.

19             THE COURT:  I mean it's already part of the record,

20   but, sure, why not.  Why don't we mark that as exhibit G.  You

21   don't have a Gar in this pile.

22             MS. WRIGHT:  I do but I'm not sure if I'll use it.

23   I'll change it if I do.

24             THE COURT:  I only have F, if you have a G I don't

25   have it.

Martinez - cross (Wright)

1          MS. WRIGHT:  I Mike not use G.  We can use G your

2     Honor, I can change it if I need to.

3          THE COURT:  I'm not going to use something you

4     already marked I have A through F.  I don't have beyond F.  I

5     don't.  Maybe there is something beyond F but you didn't give

6     it to me.  Okay now you've given additional things to me which

7     I previously did not have.  Here let me give it back to you.

8     Let's make it exhibit I, as in identify.  So the declaration is

9     now defendant's exhibit I.

10          MS. WRIGHT:  Thank you.

11          THE COURT:  For identification.  You're offering it

12     into evidence.

13          MS. WRIGHT:  Yes, your Honor.

14          THE COURT:  Any objection.

15          MR. KATZ:  No, your Honor.

16          THE COURT:  Okay, exhibit I, which is the declaration

17     of Mr. Martinez dated October 26th, 2018, is received.

18          (Party          Exhibit      received in evidence).

19          THE COURT:  Next question.

20     BY MS. WRIGHT:

21     Q.   Take a look at exhibit C which is entitled employees

22     withholding allowance certificate.  Is that your signature on

23     the document?

24     A.   Yes.

25     Q.   And at the top where it's handwritten Marco C Martinez and

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1  the address, is that your handwriting?

2          THE INTERPRETER:  May the interpreter ask

3  Mr. Martinez to break his answer.

4  A.   I only see it's a signature and the date.

5          THE COURT:  You only signed the signature.  You only

6  wrote the signature and the date is that what you're saying?

7          THE WITNESS:  Yes.

8          THE COURT:  But there is other handwriting you see at

9  the top of the page there's other handwriting there.  Us do you

10 see that?

11         THE WITNESS:  Yes.

12         THE COURT:  Who wrote that?

13         THE WITNESS:  That's my handwriting.

14         THE COURT:  You didn't write it?

15         THE WITNESS:  No.

16         THE COURT:  Who did write it?

17         THE WITNESS:  I don't remember.

18         THE COURT:  Okay.

19 BY MS. WRIGHT:

20 Q.   Looking at exhibit C --

21         THE COURT:  Why don't you offer it first before --

22         MS. WRIGHT:  Okay I'm going to move to offer exhibit

23 C into evidence.

24         THE COURT:  Any objection.

25         MR. KATZ:  No -BGS on.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          THE COURT:  Exhibit C is received.

2          (Party           Exhibit      received in evidence).

3          THE COURT:  TKPWRO ahead.

4    BY MS. WRIGHT:

5    Q.   Looking at exhibit C and exhibit B Mr. Martinez, is it

6    fair to say that the same person wrote the portions containing

7    your first, middle name and last name, i.e., Marco C Martinez

8    on both documents?

9    A.   Yes.

10   Q.   And both documents contain your Social Security number; do

11   you see that?

12   A.   Yes.

13   Q.   Did you provide this information to the person that

14   TPHEULD out the document?

15   A.   He or she wrote it there.

16   Q.   The question is did you give them your Social Security

17   number?

18   A.   I'm not sure.

19   Q.   Do you know where the person would have gotten KWROER

20   Social Security number to write it on that form if you had not

21   given it to them?

22   A.   The ones who had it were in the company.

23   Q.   Again, February 19, 2014 was the start of your employment

24   with the company; correct?

25   A.   Yes.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   Q.   Look at the Social Security number, is that your Social

2   Security number?

3   A.   Yes.

4   Q.   Going back to exhibit C right below your signature, did

5   the person who you said assisted you in filling out this form

6   explain to you that if you made any false statement on the form

7   there was a penalty of $500 that could be imposed?

8   A.   Everything is correct.

9   Q.   How did you know everything is correct if you don't read

10  English as you testified to?

11  A.   Well, everything is correct, my name is correct, my Social

12  Security number is correct.

13  Q.   How do you know what the columns were asking for if you

14  don't read English, for instance it says term *E permanent home

15  address, how do you know if that's what that was asking for in

16  exhibit C.

17        MR. KATZ:  Objection he never testified he did know

18  what it meant.

19        THE COURT:  Sustained.  Let's keep going we're a

20  little bogged down.  Is Susan WR50EUBG9 going to testify.

21        MS. WRIGHT:  Yes, your Honor.

22        THE COURT:  I have a feeling we're going to clarify

23  some of this when she testifies.

24  BY MS. WRIGHT:

25        THE COURT:  Exhibit D.  Can you take a look at

                    Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1    exhibit D in the packet, please?

2           Is that your signature on that document?

3    A.   Yes.

4    Q.   Do you know what UB were signing when you executed this

5    document?

6    A.   No.

7    Q.   Are you in the habit of signing documents without

8    understanding what they say?

9    A.   Someone read it to me.

10   Q.   Who read it to you?

11   A.   Whoever gave it to me.

12   Q.   Who was that?

13   A.   No.  I don't know, I don't not remember.

14   Q.   Did the person read it to you in English or Spanish?

15   A.   In Spanish.

16   Q.   Okay, turning now to --

17          MS. WRIGHT:  Actually your Honor I am going to move

18   to offer exhibit D into evidence.

19          THE COURT:  Any objection?

20          MR. KATZ:  D or E you said.

21          THE COURT:  D I think she said.  Is that right

22   Ms. Wright.

23          MS. WRIGHT:  D your Honor, WRES.

24          MR. KATZ:  No objection.

25          THE COURT:  Exhibit D for David is received.

Martinez - cross (Wright)

1          (Party          Exhibit      received in evidence).

2    BY MS. WRIGHT:

3    Q.    Turning now to Exhibit E, let me know when you have that

4    document -- is your signature anywhere on that document?

5    A.    It's here.

6    Q.    That's your signature?

7    A.    Yes.

8    Q.    Is the handwritten portion at the top yours?

9    A.    It is not my handwriting.

10   Q.    Do you know whose handwriting?

11   A.    No.

12   Q.    In the middle of the document there's a checkbooks where

13   it says lawful permanent resident number and there's a number.

14   Did you write that in?

15   A.    Those numbers are not mine and what I mean is that I did

16   not write them.

17   Q.    Okay, is that your permanent, lawful permanent resident

18   alien number?

19   A.    I do not know.  I have to check it with my lawful

20   permanent residence card which I have here with me.

21   Q.    Before you signed the document, did you check to make sure

22   the number that's written there was indeed your permanent

23   resident number?

24   A.    I don't remember.  Someone always helped me to fill out

25   those papers.

Martinez - cross (Wright)

1  Q.   Right below your signature there's a section where it says

2  that I attest under penalty of perjury that the information is

3  correct.  Did the person read that to you?

4  A.   No.

5  Q.   Okay.  Where it says the date right next to your

6  signature, did you fill that portion in?

7  A.   Yes.

8  Q.   So you wrote the date in but you're saying that you did

9  not write in the section where it says lawful permanent

10 resident number?

11 A.   Okay.

12 A.   They don't seem to be my numbers.

13 Q.   At the top where it says date of birth did you write that

14 number in?

15 A.   No.

16 Q.   Would you agree that the four that's reflected in all

17 three sections, date of birth, lawful permanent resident are

18 alien and where you said you wrote the date in are almost, if

19 not identical.

20       THE INTERPRETER:  Would you please read repeat the

21 question.

22 Q.   Would you agree that the number fours as reflected in all

23 three section.  Lawful permanent resident alien number that you

24 indicated you wrote in are identical.

25       MR. KATZ:  Objection asking his opinion on what

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   things look like is irrelevant.

2            THE COURT:  I don't think it's irrelevant and it's

3   perfectly permissible.  People can give opinions about

4   handwriting different than other kinds of opinions but when I

5   comes to handwriting a person can be asked, a witness can be

6   asked his opinion I think we're getting bogged down but the

7   numeral four, she said number, she me meant numeral four like

8   your date of birth, you see that?  You see that?

9            THE WITNESS:  Yes.

10           THE COURT:  Do you see the numeral four where after

11  the box that's checked for lawful permanent resident, you see

12  that numeral four in there?  You see the numeral four it says

13  zero four.

14  A.   Yes.

15           THE COURT:  Okay.  Then go down to the date.  Do you

16  see the number RAL four in that date?

17  A.   Yes.

18           THE COURT:  Are all three numeral fours the same, in

19  your opinion.

20  A.   Well they look quite.

21           THE COURT:  They look quite what?  EUFRPBLTS yes

22  according to how it's written, they look each other a lot that

23  they're mine.

24           THE COURT:  That all four, every time the numeral

25  four is written that's your handwriting?

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1              THE WITNESS:  They look a lot like mine.

2              THE COURT:  Okay.  Next question.

3              MS. WRIGHT:  At this point your Honor I'm going to

4    move to admit Exhibit E into evidence.

5              THE COURT:  Any objection.

6              MR. KATZ:  No objection.

7              THE COURT:  Received.

8              (Party            Exhibit     received in evidence).

9              THE COURT:  Go ahead Ms. Wright.

10             MS. WRIGHT:  STHR.

11   Q.    There's a second page to Exhibit E, K*U just take a quick

12   look at that and tell me if any portion of it is your

13   handwriting?

14             THE INTERPRETER:  Excuse plea counselor, what

15   section.

16             THE COURT:  Page two.  Is any of the handwriting on

17   page two of Exhibit E your handwriting?

18             THE WITNESS:  If I recognize the handwriting?

19   BY MS. WRIGHT:

20   Q.    Is any portion of the handwritten sections yours?

21   A.    Yes.

22   Q.    What portions on that document is yours?

23   A.    My name.

24   Q.    Are we talking about the section at the bottom that's

25   scratched out where it says Martinez?

                    Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1    A.   This over here?

2         THE COURT:  What does it say.

3    A.   What is underlined says Martinez.

4         THE COURT:  Sorry not following you.  What part of

5    this is your handwriting, that's the question.

6    A.   Sir may I show it to you and tell you this, this and that?

7         THE COURT:  Sure.

8         THE WITNESS:  Marco C this is my handwriting.

9         THE COURT:  Okay for the record the witness said that

10   the word Martinez, which is crossed out is his handwriting.

11        MS. WRIGHT:  Okay.

12        THE COURT:  This is your handwriting here?  Right

13   next to it where it says Wright R I G H T is not your

14   handwriting right.  (W).

15   A.   No it's not mine.

16        THE COURT:  Okay, anything else on there that's your

17   handwriting?

18        THE COURT:  Your handwriting.

19        THE WITNESS:  This here.

20        THE COURT:  For the record the witness is pointing to

21   the word "Marco" which is also stricken out, that's your

22   handwriting.  That's your handwriting next to it is not your

23   handwriting the of anything else on there you that's your

24   handwriting that you can tell.

25        THE WITNESS:  Ply handwriting.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

 1            THE COURT:  Tell me what it is.  We already talked

 2    about that.  Which one now are you talking about is your

 3    handwriting?

 4            THE WITNESS:  Here, no more.

 5            THE COURT:  Where it says 60 Sukor Road that's your

 6    handwriting?

 7            THE WITNESS:  No it's not my handwriting.

 8            THE COURT:  Mr. Martinez, I'm just asking you what is

 9    your handwriting, what is your handwriting?

10            THE WITNESS:  This, this and this one, the numbers,

11    that's it.

12            (In open court; jury present) and here.

13            THE COURT:  Okay the witness pointed to what he had

14    already testified to the word Martinez, which is stricken out.

15    The word Marco, which is stricken out, and then the date, which

16    says, 2/19/14.  Which one this one or this one?  The one that's

17    stricken out.

18            THE WITNESS:  This one.

19            THE COURT:  Okay, so the third one is it's hard to

20    read, but it's two something 2014 stricken out under the

21    certification section.  For the record he says that's his

22    handwriting I.

23            MS. WRIGHT:  Okay.

24            THE COURT:  Ask your next question.  Let's go.

25

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1  BY MS. WRIGHT:

2  Q.   Last question on this form.  The Martinez that's stricken

3  out.  Take a look at it and go back to the first page of the

4  same document and look at the Martinez there.

5  Q.   Would you agree that those both Martinez as written are

6  identical?

7              THE COURT:  Might need to help out here.  Look at

8  this word here.  You see this word that says Martinez?  For the

9  record that's on the first page of Exhibit E at the top.  You

10  SAOEU that word right there?

11             THE WITNESS:  Yes.

12             THE COURT:  It says Martinez, right?

13             THE WITNESS:  Yes.

14             THE COURT:  You see this word right here on the

15  second page which is stricken out but you can see it says

16  Martinez, you see that?

17             THE WITNESS:  Martinez.

18             THE COURT:  Is your question that that Martinez,

19  meaning the second one I just identified and the first one are

20  the same, is that your question?

21             MS. WRIGHT:  Yes, your Honor.

22             THE COURT:  So, is this one the same as this one?

23             THE WITNESS:  They're not the same.

24             THE COURT:  Next question.  I think we spent quite

25  enough time on this you're kind of losing plea.  Let's move on

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1    to something that actually matters.

2              MS. WRIGHT:  I am done with the form.

3    BY MS. WRIGHT:

4    Q.   So as you sit here today Mr. Martinez, were there ever any

5    occasion where you served as the translator for the folks at

6    Paramount, including Susan?

7              THE INTERPRETER:  Could you please repeat the

8    question, I'm or.

9              MS. WRIGHT:  S you sit here today.

10             THE COURT:  He's sitting here today.  Obviously I can

11   see it he's it ising here.

12             The question is.  When you were work willing at the

13   country club did you ever act as a translator for Ms. Wright?

14   A.   Repeat, repeat.  Who is Wright.

15             THE COURT:  Do you know Susan Wright.

16             THE WITNESS:  Oh.

17             THE COURT:  You see Susan.

18             THE WITNESS:  Sure.

19             THE COURT:  While you were working at the country

20   club did you act as a translator for Susan?

21             THE WITNESS:  Yes.

22             THE COURT:  Did you translate her English into

23   Spanish for someone else?

24   A.   No in the kitchen.  It was about everything I did there

25   depending what I did.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1          THE COURT:  What did you translate?

2   A.   I cooked for them.  Whenever she asked that she wanted to

3   know what was all that.

4          THE COURT:  So she would ask in what language?

5   A.   In English.

6          THE COURT:  And then you would translate it into

7   Spanish?

8          THE WITNESS:  No.  She would say what do you cook,

9   what is that and I translated everything.

10         THE COURT:  Into what language.

11  A.   English.

12  BY MS. WRIGHT:

13  Q.   Mr. Martin STPHRAOEUFRPLS I don't know what to say.

14  Ms. Wright.  Ask your next question.

15  BY MS. WRIGHT:

16  Q.   Mr. Martinez, did you ever serve as a TRAPBS lay are to

17  for Susanne where you translated English into Spanish for

18  anyone at Paramount?

19  A.   No.

20  Q.   Did you serve as a translator translating English into

21  Spanish for Brad black while at Paramount?

22         THE COURT:  For who?

23         MS. WRIGHT:  Brad black, K Brad black.

24  A.   I don't know who that is.

25         MS. WRIGHT:  I have no further questions, your Honor.

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1              THE COURT:  All right, I have a couple of questions.

2              How long have you lived in the United States?

3              THE WITNESS:  I've been living in the United States

4    since '87.

5              THE COURT:  Since 1987?

6              THE WITNESS:  Yes, that's correct.

7              THE COURT:  Where are you from originally?

8              THE WITNESS:  Dominican Republic.

9              THE COURT:  Before you worked at Paramount, what did

10   you do for a living?

11   A.   Cook.

12             THE COURT:  How old are you?

13             THE WITNESS:  Fifty-nine years old.

14             THE COURT:  So you came to the United States when you

15   were approximately 27 years old?

16             THE WITNESS:  Exactly, yes, sir.

17             THE COURT:  Okay any redirect.

18             MR. KATZ:  Your Honor, if I could have one moment to

19   confer with my --

20             THE COURT:  Sure.

21             MR. KATZ:  Just a few questions your Honor.

22             THE COURT:  Sure.  Redirect examination by Katz.

23   BY MR. KATZ:

24   Q.   Mr. Martinez, do you understand WRORDZ in English when

25   you're working in the kitchen?

                    Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   A.   All of them.

2   Q.   When you say all of them is that relating to food and your

3   job?

4             MS. WRIGHT:  Objection.

5             THE COURT:  What's the basis.

6             MS. WRIGHT:  Leading.

7             THE COURT:  It's leading I'm going to allow.  Get

8   through, this come O.

9             You say you understand all the words in English while

10  you're working in the kitchen is that correct?

11            THE WITNESS:  In the kitchen.

12            THE COURT:  What do they relate to?

13            THE WITNESS:  With everything I use in the kitchen.

14            THE COURT:  Food?

15            THE WITNESS:  Of course.

16            THE COURT:  Tools?

17            THE WITNESS:  Of course.

18            THE COURT:  Utensils?

19            THE WITNESS:  Yes.

20            THE COURT:  Okay, next question.

21  BY MR. KATZ:

22  Q.   Ms. Wright had asked you, did you ever translate for Susan

23  from English to Spanish; do you recall that question?

24  A.   No.

25  Q.   Was there ever a time in the kitchen where you would

Angela O'Donnell, RPR, 914-390-4025

Martinez - cross (Wright)

1   translate for Susan food words?

2   A.   Always.

3   Q.   Was there ever any other times you translated for Susan

4   other than the kitchen?

5   A.   No.

6           MR. KATZ:  No further questions, your Honor.

7           THE COURT:  Anything further Ms. Wright?

8           MS. WRIGHT:  No, your Honor.

9           THE COURT:  Thank you, Mr. Martinez you may step

10  down.

11          (Witness excused)

12          THE COURT:  Do you have any other witnesses,

13  Mr. Katz?

14          MR. KATZ:  No, your Honor.

15          THE COURT:  Okay.

16          MR. KATZ:  Plaintiffs rest.

17          THE COURT:  Let's take a brief break and we'll start

18  with any witnesses that the defendant would like to call.

19  Okay?  Ten minutes.

20          THE CLERK:  All rise this court will be in recess.

21  (recess taken) (end recess).

22          THE COURT:  Have a seat.  All right.  Ms. Wright.

23          MS. WRIGHT:  Yes, your Honor.

24          THE COURT:  So all right Ms. Wright.  Are you going

25  to call Wright, right now, Ms. Wright?  That was a joke you

center header

1    don't have to put that in the record.  Please much it's not

2    your faults, you've got a great name it's just a common name

3    and it can be spelled more than one way, that's all.  You know

4    what.  Leave it in the record.  Now that I see it it's actually

5    pretty good.

6             All kidding aside and by the way, this is a serious

7    matter and no one should think that I think otherwise.

     Ms. Wright.

8

9             MS. WRIGHT:  Yes, your Honor.

10            THE COURT:  Proceed.

11            MS. WRIGHT:  Before I proceed, do you want, I'm going

12   to call Mr. Black, but should we let the witnesses go back.

13            THE COURT:  Yes, I think so, I think if you're a

14   prospective witness you need to be outside of the courtroom.

15            THE COURT:  We'll call you when we need you.

16            MS. WRIGHT:  At this time I call Karl Bradley black

17   to the stand.

18            THE COURT:  Come on up, sir.

19    witness              , having been previously duly sworn,

20   testified further as follows:

21            THE CLERK:  Please be seated.  Please state your full

22   name for the record, spelling your last name slowly.  Karl,

23   Bradley black.  B LA CK., K A R L.  B R A D L E Y.

24   DIRECT EXAMINATION

25

                 Angela O'Donnell, RPR, 914-390-4025

center header

1    BY MS. WRIGHT:

2    Q.   Hello, Mr. Black.  What is your current position at

3    Paramount Country Club?

4    A.   I have the chief fan TP-L shall information.

5    Q.   I'm going to refer it toss PC C for brevity going forward.

6    Q.   How long have you been CFO.  Chief financial officer at PC

7    C?

8    A.   Since February of 2010.

9         Q    (By The Court) Can I interrupt for one

10   second much was Paramount Country Club previously

11   deal country club?

12             THE WITNESS:  Deal wood.

13             THE COURT:  Deal wood country club,.

14             THE WITNESS:  That is correct.

15             THE COURT:  Go ahead.

16   BY THE COURT:

17   Q.   What is your duties for SKHAOEUFPLT.

18   A.   I am responsibility for all accounting and finance aspect

19   of the country club.

20   Q.   Do you know Mr. Martinez?

21   A.   I do.

22   Q.   And how do you know him?

23   A.   I was part of the decision-making process when he was on

24   boarded back in February of 2014 as a kitchen supervisor.  That

25   it was a management position so that did involve discussions

center header

1   with myself, the general manager and the executive chef that

2   was bringing him in.

3   Q.   And back in September of 2016, did PC C outsource its

4   payroll and other H R services to another company?

5   A.   Yes we did.

6   Q.   And which company was that?

7   A.   Oasis.

8   Q.   Do you recall specifically which dates Oasis came to PC C

9   to do the on boarding?

10  A.   Yes, strategically we picked Friday, September 23 and

11  Monday September the 26th.

12  Q.   And those were the two days they were on-site?

13  A.   Yes, ma'am.

14  Q.   Did Oasis, was the on boarding held in a specific

15  location?

16  A.   Yes, it was in an OEFP room which also held the offices or

17  workstations of Theresa Lyn ski our accounts payable, accounts

18  payable and then Susan Wright our accounts receivable and

19  payroll.

20  Q.   Were you present for any portion of the on boarding that

21  was done on those two days?

22  A.   A large portion of it in and out.  He is.

23  Q.   Are you aware whether or not Mr. Martinez was involved in

24  the on boarding that Oasis conducted?

25  A.   Yes he had been required to attend an on boarding session

center header

1   with an Oasis employee.

2   Q.   Do you recall if September 26th was a date that the

3   country club was open?

4   A.   That was a Monday my recollection is we did not have an

5   outing that day.  I do recall that Mr. Martinez was unable to

6   attend on the Friday the 23 session because we had several

7   large bank wets starting with Friday night plus Saturday.  He

8   lived on property and was available on PHROPB but my

9   recollection is we did not have an outing on that day we were

10  closed for business.

11  Q.   On the 26th?

12  A.   Yes, ma'am.

13          THE COURT:  Is that typical you're closed unless you

14  have an outing.

15  A.   Yes we would be closed unless we have an outing on Monday.

16  Late September we have very few.

17  Q.   Did you also complete the on boards?

18  A.   I did.  Yes.  All employees had to regardless of their

19  title or role.

20  Q.   Do you recall just generally what day did you do your on

21  boarding?

22  A.   I did it the first day on Friday the 23.

23  Q.   As part of your on boarding were there documents that you

24  also had to complete and execute?

25  A.   KWREGS, the electronic on boarding system walked me

Angela O'Donnell, RPR, 914-390-4025

center header

1   through very specific identifying information that I had to

2   input and complete which included a I nine, a W four

3   acknowledgment of the Oasis handbook which we had an expanded

4   handbook as well for Paramount for the work site and then also

5   the acknowledgment of an arbitration agreement.

6   Q.   And you did that electronically?

7   A.   Yes, I had to do it with an Oasis employee as did

8   everybody that was on board because they were responsible for

9   the transition to their platform.

10            THE COURT:  Mr. Black, this is not your fault but you

11   tend to speak extremely rapidly.

12            THE WITNESS:  My apologies.

13            THE COURT:  I just said it's not your fault, you

14   don't have to apologize for that.  Nothing to apologize for.  I

15   do not accept your apology because it's not something that you

16   need to apologize for, however, having said that, I need to

17   understand exactly what you're saying.  It's fine for you to

18   understand it's even fine for Ms. Wright to understand it it's

19   kind of I have.  If I don't understand it it goes into the

20   ether somewhere.

21            MS. WRIGHT:  Yes.

22            THE COURT:  Please try to speak more slowly, just

23   try.

24            THE WITNESS:  Certainly.

25            THE COURT:  If I interrupt you and ask you to slow

Angela O'Donnell, RPR, 914-390-4025

center header

1   down it's not because I'm being critical it's because I need to

2   understand you're saying.

3          THE WITNESS:  Understood, year *S yes, sir.

4          THE COURT:  All right let me just back up one second.

5   So the bottom line is that you, like every other employee at

6   Paramount had to go through this on board, this so-called on

7   boarding process with an Oasis employee.

8          THE WITNESS:  That is correct I.

9          THE COURT:  Err.

10         THE COURT:  You like everyone else had to fill out

11  forms with the Oasis employee.

12         THE WITNESS:  That is correct.

13         THE COURT:  Including the arbitration agreement.

14         THE WITNESS:  That is correct.

15         THE COURT:  I think I've government it.  SKR.

16  BY MS. WRIGHT:

17  Q.   How many employees conducted the onboarding as far as you

18  recall.

19  A.   I don't recall, I know of two right off the top of my

20  head.  They may have had some additional, but certainly two.

21  The only one I recall specifically is tar in.

22  Q.   Were there Spanish speaking employees who completed the on

23  boarding if you know?

24  A.   Yes.

25  Q.   What options were made available for those employees?

center header

```
 1              THE COURT:  You see at you're doing it.  You've

 2    TKPW-T to wait till you finishes.  Don't rush.  We're going to

 3    take as much time as we need.  Wait for her question to end,

 4    pause, answer the question in a deliberate fashion.  Not in a

 5    quick fashion, you're you don't have to rush.

 6              THE WITNESS:  Okay.

 7              THE COURT:  Even though that's your normal speaking

 8    style try to not do that's correct okay.  All right.  I'm

 9    sorry.  Let's see.

10              THE COURT:  Were there Spanish speaking employ geez

11    you see I'm speaking slowly right TPHROU.  Were there -PB

12    payroll company EURB speaking employees who completed the on

13    boarding if you know.  Your answer yeahs yes and then the next

14    question was, I think, what options were made available for

15    those employees meaning the Spanish speaking employees, go

16    a4ED.

17              THE WITNESS:  As part of the electronic portion, the

18    very first page gave you an option to click if you wanted to

19    complete the electronic process through Spanish.

20    Q.    Okay.

21    A.    In addition to the fact that the Oasis employees also

22    spoke Spanish.

23    Q.    What types, just generally, what types of personal

24    information were you required to input while you were doing the

25    on boarding?
```

center header

1  A.    From the start of it it would have been my home address,

2  my Social Security number, then moving into the W four how many

3  dependents I was claiming for tax purposes, and then I also

4  needed my driver's license number and my passport number for

5  the I nine portion of that on boarding process.

6  Q.    Okay.  During your tenure at PC C, did you have occasion

7  to interact or speak with Mr. Martinez?

8  A.    On a very regular basis, yes.

9  Q.    And do you speak Spanish?

10  A.    Not at all.

11  Q.    Do you understand Spanish?

12  A.    No, I'm sorry I wish I did but I do not.

13  Q.    What language did your conversations with Mr. Martinez

14  occur in?

15  A.    They were always in English.

16  Q.    What were some of the things you recall speaking to him

17  about?

18  A.    You know, most days it was pleasantries as I was

19  progressing through the kitchen.  On several occasions it was

20  work related where I was part of conversations with vendors

21  that he was dealing with.  We would discuss specific banquet

22  menus but there were several times since he REUFD on property I

23  would be in front of the club close to what we call the night

24  house the employees housing area.  We'd have conversations, I

25  remember one very distinctly regarding the bike that he had.  I

center header

1   had just bought a similar bike by the same manufacturer.  I

2   recall having conversations about his businesses that I think

3   he still owns in the Dominican Republic.  About his children.

4   We talked about many things across many spectrums.

5   Q.   In any of those conversations, did Mr. Martinez speak

6   Spanish with you?

7   A.   Not that I recall.

8   Q.   While you were present during the on boarding, did you

9   observe any Oasis employees completing the on boarding for

10  another Paramount employee?

11  A.   Absolutely not.

12  Q.   Same question, while you were at the on boarding, did you

13  observe any PC C employee completing the on boarding process

14  for any other employees?

15  A.   Absolutely not.

16  Q.   What safeguards were in place to prevent this from

17  happening?

18  A.   From the PC C side we hadn't even been TRAEUPD on the

19  employee TPORGS portion of the on boarding process.  That

20  occurred after the employees were on boarded by Oasis.  Just

21  the fact that the location of where the on boarding occurred

22  was a wide open space with 8-foot tables.  Oasis had under our

23  contract had the responsibilities of the transition and the on

24  boarding so they would observe if we had done anything and vice

25  versa.  We would have no purpose in doing that portion of it.

center header

1   It was the beginning of our membership year we were extremely

2   busy Susan and I, because we're ready to process our first

3   cycle billing and there was a gazillion chores on that plate at

4   our time.

5           THE COURT:  Which time is this.  What timeframe.

6           THE WITNESS:  We do our billing at the end September.

7   Our membership runs through October 1 TRO*U September 30th at

8   that time in its TRAPBS PHAEUGS one month further.

9           THE COURT:  Okay.

10  Q.   What happened to the forms you treated to to on boarding.

11  For instance the arbitration form.  What if anything EUFPL a?

12  A.   That is retained bio *S Oasis is my understanding.

13  Q.   Have you seen yours or any other employees arbitration

14  form since the date of on boarding?

15  A.   At that time I have seen one example of it due to this

16  lawsuit.

17  Q.   Okay, other than the lawsuit?

18  A.   No, I have not seen any of them.

19          MS. WRIGHT:  I have no further questions for this

20  witness, your Honor.

21          THE COURT:  Okay any KWROS?

22          MR. KATZ:  We have no questions, your Honor.

23          THE COURT:  Okay.  Thank you, sir, you may step down.

24          (Witness excused)

25          THE COURT:  Okay call your next witness.

                Angela O'Donnell, RPR, 914-390-4025

center header

```
 1          MS. WRIGHT:  Ply next witness at this time, your
 2   Honor, is Susan Wright.
 3          THE COURT:  Susan Wright.  Someone might want to
 4   go -- okay you're going to do that, good.
 5    witness          , having been previously duly sworn,
 6   testified further as follows:
 7   DIRECT EXAMINATION
 8          THE CLERK:  Please be seated.
 9          THE WITNESS:  Thank you.
10          THE CLERK:  Please state your full name for the
11   record spilling your last name slowly.
12          THE WITNESS:  Susan Wright.  W R I G H T.
13          MS. WRIGHT:  Thank you your Honor.
14   Q.   Ms. Wright what is your can you repeat position at
15   Paramount Country Club?
16   A.   Accounts receivable and payroll bookkeeper.
17   Q.   Going forward I'll will he refer it as PC C for brevity.
18   Tell me just briefly what your duties are in that capacity?
19   A.   I manage member accounts, billing, monthly billing, their
20   statements, I also process the payroll for the company export
21   time card information, put it into another program where I have
22   to, that I can go into manual do things if somebody is out of
23   commission or whatever and I send it into the company, Oasis
24   and they process all the rest of it into checks.
25   Q.   How long have you served in this capacity?
```

center header

1    A.   Since 2003.  August.

2              THE COURT:  Let me just ask you a quick question I

3    think I know the answer but let's put it on the record.  Are

4    you related in any way to Ms. Wright the attorney for

5    Paramount.

6              THE WITNESS:  No I'm not.

7              THE COURT:  Thank you.

8    BY MS. WRIGHT:

9    Q.   Do you recall that there came a time when PC C outsourced

10   its payroll and other HR processes to Oasis?

11   A.   I'm sorry, I have a hard time HAEUFRLG I've got one good

12   here.  Can you repeat the question.

13             MS. WRIGHT:  Sure, was there a time PC C outs sourced

14   payroll and other processes HR processes to Oasis.

15   A.   Yes there was.

16   Q.   Do you recall around when this was?

17   A.   2016.

18   Q.   What dates did the Oasis on boarding occur?

19   A.   September 23 and 26 it flanged the weekend.

20   Q.   I'm sorry?

21   A.   It flanged a weekend.  It was a Friday and a Monday.

22   Q.   And what was your role during the on boarding process that

23   Oasis conducted?

24   A.   Observing.

25   Q.   Did you you yourself undergo on boarding?

              Angela O'Donnell, RPR, 914-390-4025

center header

1    A.    Yes, I did.

2    Q.    When did you do yours?

3    A.    I did PHRAOEUPB, I believe on that Friday.   (mine).

4    Q.    Do you recall if there were documents that you signed as

5    part of this process?

6    A.    Yes.

7    Q.    Did those documents include any employee agreements STPHR?

8    A.    Yes.

9    Q.    What else do you specifically recall signing?

10   A.    The state and federal tax forms, I nine form, the employee

11   acknowledgment form, it wasn't a form you had to sign but you

12   had to fill out your emergency contact information, direct

13   deposit.  There might be one or two others the basics were your

14   federal and state forms and your I nine forms that are very

15   important to have and any kind of agreements.

16   Q.    The employee acknowledgment form that you completed, did

17   it include an arbitration agreement as well?

18   A.    Yes.

19   Q.    And was that something that you had to fill out as part of

20   the on boarding?

21   A.    I had to sign for it, yes.

22             THE COURT:  You had to what, sign for it.

23             THE WITNESS:  Yes.

24             THE COURT:  How did you sign it?

25             THE WITNESS:  It was electronic signature.

center header

1    BY MS. WRIGHT:

2    Q.    So, just walk me briefly through the on boarding process,

3    you go into the room and then what happens?

4    A.    We sat down with one of the Oasis representatives who sat

5    with me, guided me through, it got me to a portal website where

6    you had to put in a client ID and an inputting number and you

7    started with your personal your Social Security your first name

8    your last name, you also had the option of English or Spanish

9    and then I think at that point you would go to the next steps

10   which were all the other following documents, the state and

11   federal forms, your citizenship you had to -- that wasn't

12   something I think you had to sign for but you had what you were

13   a citizen an alien or what ever the case may be in the I nine

14   information (the acknowledgment, there was another one I think

15   about commute tier taxi think I remember being in there.  That

16   was the gist of all of the documents in there that I recall.

17   Q.    For the two days that the Oasis on boarding occurred were

18   you present for both of those days?

19   A.    Yes.

20   Q.    And was there -- actually strike that.  Do you know if

21   Mr. Martinez was also on boarded on either of those days?

22   A.    I don't recall him at TPHEUZ particular time but yes, I

23   know he was on boarded one of those couple of days.

24   Q.    Okay.

25              THE COURT:  About how long did it take you to fill

center header

1   out all these forms and sign the forms and that process you

2   described for yourself I'm talking about.

3   A.   For me?  I ask a lot of questions, so it took me a little

4   while like 20 minutes.

5            THE COURT:  How many.

6   A.   Twenty minutes I.

7            THE COURT:  And you said you were actually in the

8   room for two days when employees were being on board.

9            THE WITNESS:  Yes.

10            THE COURT:  Why were you there what was your role.

11            THE WITNESS:  To observe, to watch what they were

12   doing so it was something that I would eventually be needing to

13   do going forward.

14            THE COURT:  In the future.

15            THE WITNESS:  In the future.

16            THE COURT:  Someone two months later got hired you

17   would do it.

18            THE WITNESS:  Yes.

19            THE COURT:  Hip TEUFP I can HREU how long, I'm sure

20   it varied much typically how long did it take for a PWHROEU ye

21   to fill out all those forms electronically?

22            THE WITNESS:  It could easily take a half an hour.

23            THE COURT:  Could it take five minutes?

24            THE WITNESS:  Yeah, if they were knew what they were

25   doing a lot of people I'm familiar with have never done this

center header

```
 1   before, not filled out worked documents, you know their tax
 2   forms stuff like that.  So it could take them a little while,
 3   but, yeah, if you knew what you were claiming on your state and
 4   federal it could take you just a few minutes to do as well.
 5              THE COURT:  Okay sorry go ahead Ms. Wright.
 6              MS. WRIGHT:  Thank you.
 7   BY MS. WRIGHT:
 8   Q.   Did the Oasis person on-site give any kind of explanation
 9   for introduction before the on boarding began?
10              THE WITNESS:  I don't recall but I'm sure that they
11   did.  I know they didn't just come in and sit down and we sat
12   down with them like you know a conveyor belt type thing.  There
13   was definitely a lot of conversation a lot of communication
14   going on.  He it was a busy heck tech couple of days in there,
15   it was crazy and there was a lot of talk going O.
16   Q.   Are you aware that Mr. Martinez is claiming that he met
17   with you on September 26 and that this was at least a week
18   after Oasis had been on-site?
19              THE COURT:  Wait, wait, wait, wait.  Did he say that?
20   I don't recall him saying that.
21              MS. WRIGHT:  Yes, your Honor.
22              THE COURT:  First of all he said he wasn't exactly
23   sure then you refreshed his recollection.
24              MS. WRIGHT:  And he said it was at least a week maybe
25   two weeks after Oasis came on that he met with Susan.
```

center header

```
 1              THE COURT:  Oh that he met with Susan.

 2              MS. WRIGHT:  Yes.

 3              THE COURT:  First he was there for the Oasis and then

 4    a week or two later he met with Susan.

 5              MS. WRIGHT:  That's what he said.

 6              THE COURT:  All right.  I don't remember that

 7    specifically, I thought you were saying that -- never mind what

 8    I thought.

 9              MS. WRIGHT:  It's okay.

10              THE COURT:  Okay.  Ask the question again.

11              MS. WRIGHT:  Sure.

12    Q.   Are you aware that Mr. Martinez is saying on September 26,

13    when he met with you and that was a week or two after the Oasis

14    persons had come on-site?

15    A.   I'm aware he said something to that effect, yes.

16    Q.   Did you complete any of the on boarding process for

17    Mr. Martinez?

18    A.   No, I did not.

19    Q.   Did you fill out any of the forms for Mr. Martinez?

20    A.   No, I did not.

21    Q.   Was there any occasion where you met with Mr. Martinez

22    while the on boarding was taking place where you were inputting

23    his information in the computer?

24    A.   I don't remember him, I don't remember him at all.  I

25    don't remember meeting with anybody.
```

Angela O'Donnell, RPR, 914-390-4025

center header

1   Q.   Would you have -- did you complete the on boarding for any

2   PC C employee?

3   A.   No, I did not.

4   Q.   Did you complete the I don't know boarding when I same

5   come input the on boarding information for any employee either

6   on the 23 or on the 26th?

7   A.   No, I did not.

8   Q.   Did you sign or fill out the employee acknowledgment form

9   for any PC C employee at any time?

10  A.   No, I did not.

11             MS. WRIGHT:  I'm almost done, your Honor.

12             THE COURT:  The employee acknowledgment form an is

13  that the arbitration agreement?

14             MS. WRIGHT:  Yes, your Honor.

15             THE COURT:  Let's just identify so we're clear on

16  this.  Do you have the exhibits in front of you?

17             THE WITNESS:  I do have stuff here.

18             THE COURT:  It's Exhibit A.

19             THE COURT:  Look at Exhibit A if you don't mind it's

20  got a tab.  (that was Wright).

21             THE WITNESS:  Yes.

22             THE COURT:  It has Mr. Martinez's name printed on the

23  bottom.  On the top it says employee acknowledgments you see

24  that.

25  A.   Yes.

center header

1          THE COURT:  The third paragraph talks about legal

2   disputes with my work cite employee and WHRAPS in those

3   situations and so forth you see all that?

4          THE WITNESS:  Uh-hum.

5          THE COURT:  This is the owe so-called employee

6   acknowledgment form that you also filled out.

7   A.   Yes.

8          THE COURT:  And you signed it yourself personally.

9          THE WITNESS:  Yes.

10         THE COURT:  Did you have anything to do with

11  Mr. Martinez filling out this form?

12         THE WITNESS:  No, I did not.

13         THE COURT:  Okay.

14         THE WITNESS:  All right.

15  BY MS. WRIGHT:

16  Q.   May I continue?

17         THE COURT:  Sure.

18  BY MS. WRIGHT:

19  Q.   Ms. Wright.  To your knowledge does Mr. Martinez

20  understand English?

21  A.   Yes.

22  Q.   How do you know?

23  A.   I've spoken to him.

24  Q.   Give me some of the occasions or examples when you've

25  spoken to him in English?

Angela O'Donnell, RPR, 914-390-4025

center header

1    A.   Besides just greeting him daily in the kitchen because

2    that's where the employees are allowed to go and get their

3    cough fees so I would see him ATD least three times a week he'd

4    have days off during the week I'd be there.  I'd see three

5    times a week, good morning how you doing, what are you making

6    what's the employee PHRAOEL but specifically when he started I

7    needed a letter from his insurance company the dental stating

8    that he was no longer covered by his former employee's dental

9    so that he could get on your dental plan, that's how the

10   insurance companies work they're not going to pick you up until

11   they know you've been terminated from your previous employer's

12   coverage and I had many conversations with him about that and

13   not to his fault it WRAEPBT happening -PBG I think who he was

14   speaking to kept dropping the ball I know I had several

15   conversations you've got to get this letter.  We've got to get

16   you on the insurance.  We've got to get it sooner than later

17   time is running out.  I had those conversations with him,

18   excuse me, I remember his injured his beginning gear and I had

19   to get the (finger) I had to get the details of the injury of

20   what happened so I remember him telling me what happened to his

21   finger, because I have to do the insurance documentation to

22   send in to our worker's comp, get him a ride to the hospital,

23   one of the co-workers brought him down, I remember talking to

24   him about that and I actually wanted to see what happened to

25   him.  It looked like a terrible injury I wanted to see what

center header

1  happened, I talked to him about that and the last thing I

2  remember was and this happened a few times at least a couple of

3  tiles I needed him to interpret to another employee how to use,

4  at the time it was ADP, a hand scanner, you had to place your

5  hand on the scanner so it would take a picture of the outline

6  of your hand, it had to be done a specific way, had to be done

7  three times, we had to read the reading was saying in case it

8  wasn't working we had to do it again, and he was very helpful

9  with me in getting across to the employee -- hold it you're

10 doing it wrong you've got to put your hand this way what ever.

11 We've we have to do it again you've got to put your number N he

12 definitely helped me.  I specifically remember one occasion

13 when he helped me get somebody on to the hand scanner to

14 interpret.

15 Q.   All those conversations were in English?

16 A.   Yes.

17 Q.   Do you speak Spanish?

18 A.   No, I don't.

19 Q.   Do you understand Spanish?

20 A.   Other than a greeting OL la and *adios*, no.

21 Q.   *R?

22       THE COURT:  When he was helping you with other

23 employees wags he helping you in the sense of translating your

24 instructions in English into Spanish for Spanish speaking

25 employees is a that what you're talking about.

Angela O'Donnell, RPR, 914-390-4025

center header

```
1    A.   Yes.

2              THE COURT:  Are there a lot of Spanish speaking

3    employees in the kitchen.

4    A.   Yes.

5              THE COURT:  All of them.

6              THE WITNESS:  Not all of them.

7              THE COURT:  A lot of are.

8              THE WITNESS:  A lot are, yes.

9              THE COURT:  Mr. Martinez helped you communicate with

10   them.  You don't speak Spanish they don't speak English.

11   A.   Exactly.

12             THE COURT:  He was the translator.

13   A.   Yes.

14   Q.   Do you recall what month and year Mr. Martinez was hired?

15   A.   I remember the issues with the letters in March of 14 I

16   would say around that time we wanted to get him on the

17   insurance.

18   Q.   Did he have to submit forms --

19   A.   Yeah, there would have been forms he would have had to

20   fill out.  It would have been for the dental and a medical form

21   also.

22   Q.   Would that have been done with you or someone else.

23   Q.   It would have been done with me.  It could have been a

24   form handed maybe by my boss Brad he had to he fill out.  But

25   it needed to be splitted to us.
```

center header

1    Q.    Do you specifically filling out of those forms out?

2    A.    I don't specifically remember sitting watching him fill it

3    out.  I know that what looked like his handwriting we did get

4    throws forms back.  STKPWHR* *FR.

5    BY THE COURT:

6    Q.    Can you take a look at what has been marked as Exhibit E

7    in the packet that's right there.  It's the I nine form?

8    A.    Oh, yeah, okay.

9    Q.    Flip to the first page.  Do you know whose handwriting

10   that is where it says employee information and attest TAEUGS?

11   A.    I for TKPW-T my blahs easy can read that part.

12          THE COURT:  Everybody's forgetting their glasses

13   today.

14   A.    I had them I think they're in my baggy can read it enough.

15   I see what I'm looking at.

16          THE COURT:  I'm not sure you answer defendant

17   question.  The question do you know whose handwriting that is

18   where it says employee information and attest TAEUGS section

19   one.

20          THE WITNESS:  I believe that is his handwriting

21   because it's not mine.

22   Q.    Other than the fact that it's not yours, do you know for

23   sure if it's his handwriting?

24   A.    It would -- in all likelihood.  I don't remember him

25   filling this out.  But yes, it looks like his handwriting,

center header

1   because I've seen his signature before that's his signature

2   also.

3   Q.   What about the handwriting, have you seen his handwriting

4   before?

5   A.   I've seen it on other documents, yes.

6   Q.   And does that look like his handwriting?

7   A.   Yeah.

8   Q.   Next page, where it says certification on that same

9   document?

10  A.   Yes.

11  Q.   There is a name written and scratched outright next to

12  where it says right?

13  A.   Yes.

14  Q.   Is any portion if that section your handwriting?

15  A.   Where it's rewritten it's my handwriting.

16  Q.   Where it's rewritten right?

17  A.   Where it says Wright and Susan and the other parts are my

18  handwriting.

19  Q.   Where it's scratched out where Martinez and Marco is

20  scratch outed whose handwriting?

21       THE WITNESS:  That's his handwriting.

22  Q.   Where it says the business or organization address, whose

23  handwriting is that?

24  A.   The 60 suck correspondence road that's mine.

25  Q.   And where it says the date at the top.  First day of

Angela O'Donnell, RPR, 914-390-4025

center header

1   employment.  (Zukor (it's scratched out?

2   A.   It's scratched out that's his handwriting.

3   Q.   Where it's rewritten?

4   A.   That's my handwriting.

5   Q.   Were there any other occasions you have not mentioned

6   where you heard or saw or heard actually Mr. Martinez speaking

7   English?

8   A.   Not specifically that I recall, I know that I definitely

9   always I do with all of the kitchen staff, whenever they're

10  making something and I'm not familiar with what it is I want to

11  know what it is.  What are you making why are we having this

12  for lunch.  Why are you PHRAEUBGing this.  Can we get something

13  for the employee PHRAOEL I know I had a lot of throws

14  conversation -FRS with him.  Just friendly banter.

15          THE COURT:  Ms. Wright.  Attorney right just wait a

16  second.

17          MS. WRIGHT:  Sure.

18          THE COURT:  Ms. Wright I think you said on the second

19  page PWR it says 60 Zukor road you said that's your

20  handwriting.

21          THE WITNESS:  The 60 Zukor road.

22          THE COURT:  You see the Z has a cross hatch.

23          THE WITNESS:  Yeah that's mean.

24          THE COURT:  The K is a capital K.

25          THE WITNESS:  I yes.

center header

1          THE COURT:  The K is the K.  That's your handwriting.

2    A.   Yes.

3          THE COURT:  Look on the IRS if TPAEUPBLG at the top.

4          THE WITNESS:  That's me writing in his address.

5    Sixty Zukor road that's my handwriting just the address part.

6    New City, New York.

7          THE COURT:  So the address, the 60 Zukor road that's

8    the country club's address.

9          THE WITNESS:  Yeah, because, and I'm just

10   speculating, but he didn't always live at the country club, he

11   lived elsewhere, so there was probably a question as to what he

12   was going to use as his address.  Once he established he was

13   going to be living on country club property, it may have been

14   something that was filled out after the fact when he was done.

15         THE COURT:  So the first line, this is Martinez Marco

16   that's not your handwriting.

17         THE WITNESS:  Correct.

18         THE COURT:  The third line which has a date of birth

19   and a Social Security number is not your handwriting.

20         THE WITNESS:  Correct.

21         THE COURT:  But the second line,.

22         THE WITNESS:  Is my handwriting.

23         THE COURT:  Wait wait till I finish.

24         But the second line.  Sixty Zukor road New City, New

25   York 10956, that is your handwriting.

Angela O'Donnell, RPR, 914-390-4025

center header

1          THE WITNESS:  Correct.  STKPWHRAEUFRPBLGS moving down

2     the page where it has a handwritten A number.  Alien

3     registration number.  Zero forty-one et cetera, is that your

4     handwriting?

5          THE WITNESS:  No.

6          THE COURT:  And then the signature down below there

7     and the date are either of those your handwriting?

8          THE WITNESS:  No.

9          THE COURT:  So did you fill in the parts that you

10    filled out, in other words, the address, after Mr. Martinez had

11    filled out his name and birth date and Social Security number

12    and the other number on there.

13         THE WITNESS:  I don't know if it was after, he may

14    not have even.  A lot of people don't know how to spell the

15    name Zukor, I don't know when that was filled out.  He may not,

16    he may have been in transition at that point waiting for a room

17    to be available, I honestly don't know why it's filled out, I

18    know, I speculate why it's filled out separately but I don't

19    remember when it was done.

20         THE COURT:  On the second page where the Martinez and

21    Marco are crossed out.

22         THE WITNESS:  Yes.

23         THE COURT:  Then Wright and Susanne and are written

24    in.  Can you TKROS cross out Martinez and Marco.

25         THE WITNESS:  Yes, I did.

                Angela O'Donnell, RPR, 914-390-4025

center header

1              THE COURT:  Is that because this was information for

2       the.

3              THE WITNESS:  Verify year.

4              THE COURT:  For the employer not the employer to fill

5       out.

6              THE WITNESS:  Correct.

7              THE COURT:  At least that was your understanding of

8       it STPHR.

9              THE WITNESS:  Yes.

10             THE COURT:  But Martinez Marco was written by

11      Mr. Martinez.

12             THE WITNESS:  Yes.

13             THE COURT:  You realized it WALGSZ wrong you wrote

14      Wright, Susan.

15             THE WITNESS:  Exactly.

16             THE COURT:  I've got it.  PHAO*U.  UFRPBLTS move on.

17      Q.   The last question, the the very top.  The Marco Martinez

18      Cabrera.

19      A.   Yes that's my handwriting copying it off his permanent

20      resident car.

21             MS. WRIGHT:  I have no further questions for this

22      witness your Honor.

23             THE COURT:  Any cross.

24             MR. KATZ:  Yes, one second your Honor.

25             THE COURT:  Before you even SKR the cross you may

center header

1    have asked this question, Ms. Wright.  The attorney, if you did

2    I missed it.  When you were doing, when the employees of the

3    country club are doing the on boarding process with Oasis, you

4    testified that they were there to provide assistance but that

5    you at least you did all of the reviewing of documents on the

6    computer and filling them out and E signature you did that

7    yourself.

8              THE WITNESS:  For me.

9              THE COURT:  For you.

10             THE WITNESS:  Yes.

11             THE COURT:  Did they do it for any employees or

12   because you were there for two days right.

13             THE WITNESS:  Not that I saw.  Nope.

14             THE COURT:  So what were they doing exactly?

15             THE WITNESS:  We had about 100 employees, so we had

16   them backed out in the hallway.  They were taking care of other

17   employees.

18             THE COURT:  So let's say not Mr. Martinez but just

19   some generic employee other than yourself and other than

20   Mr. Martinez they're kind of coming in, doing what they have to

21   do and going back out.

22             THE WITNESS:  Yes.

23             THE COURT:  How many different computer are being

24   used is it one come you the punitive damages tier.

25             THE WITNESS:  No, no.  I don't recall.  I think it

Angela O'Donnell, RPR, 914-390-4025

center header

1    was four or six.

2            THE COURT:  So there were a lot of different sort of

3    workstations EUFRPBLTS I'd say there wear at least four just

4    don't remember.

5            THE COURT:  Controlled chaos was being overseen by

6    the Oasis employees.

7            THE WITNESS:  Yes.

8            THE COURT:  This hypothetical.  This generic

9    employees comes in can you just describe me would Oasis say

10   this is where you have to sit and sort of get them started but

11   then from there let them do it.

12           THE WITNESS:  No the Oasis personnel people were

13   there the entire time.  They didn't leave my side when I was

14   oasis boarding.  They really couldn't, because there was, they

15   had to be there for questions and they were, they were very

16   helpful and like me, I asked a lot of questions.  So they were

17   there I'd say from start to finish, I mean there were a couple

18   of times where I left the room I had other job duties to do.

19   Go to the bathroom what ever, I would pass that table when I

20   went to my work area and they have were always there.  There

21   was never TPHREUB sitting there on a computer not getting help

22   from an Oasis employee.

23           THE COURT:  I understand that.  But I have a slightly

24   different question.

25           THE WITNESS:  Okay.

                    Angela O'Donnell, RPR, 914-390-4025

center header

1          THE COURT:  Did you ever observe, I know you said

2     this didn't happen with you, but did you ever observe another

3     employee utilize the Oasis employee to fill out the forms?  In

4     other words, the PC C employee says, well, gist fill it out for

5     me or here's the information.

6          THE WITNESS:  No.

7          THE COURT:  You can put it in there.  Here's what I

8     want you to say or anything of that nature you see what I'm

9     saying?

10         THE WITNESS:  Yes.

11         THE COURT:  Utilizing them to actually fill out the

12    forms EURPBLGTS no, I did not see any of that and.

13         THE COURT:  How about the Spanish speaking employees.

14    Not Mr. Martin he is.  In your view Mr. Martinez spoke pretty

15    good English even though his native language is Spanish.

16    Correct.  Obviously his native HRAPBG WAEUPBL is swan EURB.

17         THE WITNESS:  That may be.  I can't say what it is or

18    not.  Obviously you hear him you hear an accent it was never

19    confirmed anywhere.  Never told to me.

20         THE COURT:  He speaks Spanish no question about that.

21    In fact you utilized him to speak Spanish to the employees

22    EUFRPBLTS yes.

23         THE COURT:  -- who didn't speak inHREURB, you have to

24    say yes or no, you can't flood your head.

25         THE WITNESS:  I'm sorry, yeah yes, I realized that

Angela O'Donnell, RPR, 914-390-4025

center header

1    that may be his first language because he did speak both

2    languages -T.

3              THE COURT:  APBL you know that because sometimes you

4    would speak to him in English.

5              THE WITNESS:  Yes.

6              THE COURT:  He would translate it into Spanish.

7              THE WITNESS:  Correct.

8              THE COURT:  For the non English speaking employees

9    and then he would translate their Spanish responses into

10   English for your benefit clearly he spoke Spanish.

11             THE WITNESS:  No, no I can't say for sure.  I don't

12   know what his heritage that's his first language I go by

13   documentation I have to.

14             THE COURT:  I'm with you so far.  I'm trying to find

15   out.  There were definitely employees there who don't speak

16   English or speak it very poorly is that correct.

17   A.   Yes.

18             THE COURT:  You flow that because you had to use

19   Mr. Martinez as as translator.

20             THE WITNESS:  Yes.

21             THE COURT:  When those employees were filling out the

22   forms electronically, what level of assistance do you remember

23   them getting from the Oasis employees?

24             THE WITNESS:  Span I can speaking Oasis person.

25             THE COURT:  Who would do what?

                    Angela O'Donnell, RPR, 914-390-4025

center header

1              THE WITNESS:  Who would do the same thing with them,

2    guide them but in their language in the Spanish language.

3              THE COURT:  But not fill out the forms for them.

4              THE WITNESS:  No, not fill out the forms.  No.

5              THE COURT:  Just be there to answer questions and

6    sort of point them in the right direction EUFRPBLTS yes.

7              THE COURT:  But the form filling is done by the

8    employees whether it's English or Spanish.

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.

11             MS. WRIGHT:  I am done.  I just wanted to move to

12   offer Exhibit A into evidence.

13             THE COURT:  Which one.  On clerk KHR-RBG A.

14             THE COURT:  As in apple.

15             MS. WRIGHT:  Yes, your Honor.

16             THE COURT:  That's a pretty important document, I

17   suppose.  Any objection to that?

18             MR. KATZ:  No, your Honor.

19             THE COURT:  So let's just see Exhibit A is received.

20   Okay.  You know while we're on the subject.  You didn't show

21   her Exhibit F #, I don't think, but Exhibit F at least appears

22   to be something dealing with dental insurance which she did

23   testify about.

24             MS. WRIGHT:  Oh, sure.

25             THE COURT:  Would you look at Exhibit F for a moment.

center header

1              THE WITNESS:  Yes.

2              THE COURT:  Do you know what this is?  EUFRPBLTS yes.

3              THE COURT:  What sit EUFRPBLTS it's a dental

4    application dental insurance.

5              THE COURT:  For whom?

6              THE WITNESS:  For Marco C quo.

7              THE COURT:  Did you have anything to do with

8    completing this document?

9              THE WITNESS:  I gave it to him to fill out, but I

10   didn't, this isn't my handwriting.

11             THE COURT:  So you remember, you talked about this

12   dental insurance thing where you had to cancel the other one

13   EUFRPBLT yes.

14             THE COURT:  In order to get yours or get the one

15   provided by you.

16             THE WITNESS:  Correct.

17             THE COURT:  Is this the form he had to fill out

18   EUFRPBLTS yes.

19             THE COURT:  -- for your dental insurer, guardian.

20             THE WITNESS:  Yes.

21             THE COURT:  So you gave him the form.

22             THE WITNESS:  Yes.

23             THE COURT:  But he filled it out EUFRPBLTS I probably

24   checked off, I can't really read it.  I know a lot of employees

25   had a question about unwith of the sections T-PD.

Angela O'Donnell, RPR, 914-390-4025

center header

1          THE WITNESS:  Section three, nobody knew whether it

2   was indemnity PP L.  Even I had to ask my boss, what are we

3   again a PPO.  I checked that I probably collected while I was

4   at it I checked new employee add employee.

5          THE COURT:  But then the rest of it is in

6   Mr. Martinez's handwriting.

7          THE WITNESS:  Correct.

8          THE COURT:  Including you see that Z there by the

9   way.

10          THE WITNESS:  Oh yes.

11          THE COURT:  Zukor road that's cross hatched.

12          THE WITNESS:  You do that too.

13          THE WITNESS:  Yeah it's interesting.  I don't know

14   whether you want to offer Exhibit F into evidence or not or

15   whether you were going to do it with an another PROEU ye.

16          MS. WRIGHT:  I can offer it into evidence at this

17   time your Honor.  I do intend to offer it.

18          MR. KATZ:  No objection.

19          THE COURT:  I don't think it was a great deal of

20   relevance, but I'll receive it.  Exhibit F is received and also

21   Exhibit A which is the employee

22   acknowledgmentsrcertifyqrcertifyqrcertifyq form is also

23   received.  **** ATTENZIONE **** ATTENZIONE **** ATTENZIONE ****

24   ATTENZIONE.

25          (Party        Exhibit     received in evidence).

                Angela O'Donnell, RPR, 914-390-4025

center header

1          THE COURT:  Okay, Mr. Katz.

2          MR. KATZ:  Thank you, your Honor.  Direct

3    examination.

4    CROSS EXAMINATION

5    BY MR. KATZ:

6    Q.    TKPWAO*RPB?

7    A.    TKPWAO*RPB.

8    Q.    In preparation for this testimony did you review the

9    declaration of Marco Martinez that was submit inned the court

10   papers?

11   A.    Yes, I did review it.

12   Q.    And in your answers to your attorney, you stated that you

13   were aware that Mr. Martinez is claim TKHAG he met with Oasis

14   two weeks before he met with you; correct?

15   A.    Yes.

16   Q.    During the break after Mr. Martinez testified here, did

17   Mr. Black discuss Mr. Martinez's testimony with you?

18   A.    Can you repeat the question, please I can't hear you.  I'm

19   sorry.

20          THE COURT:  I have that problem too.  Come on

21   Mr. Katz.  Look how big this room is.

22          THE WITNESS:  I don't hear on this either.

23          MR. KATZ:  Sorry I thought the microphone did it.  On

24   a break from testimony after Mr. Martinez testified today did

25   Mr. Black discuss Mr. Martinez's testimony with you.

Angela O'Donnell, RPR, 914-390-4025

center header

1    A.    No, I didn't see him.

2    Q.    On the break after Mr. Martinez testified, did either of

3    your attorneys without telling me what they said discuss

4    Mr. Martinez's testimony with you?

5    A.    No.

6    Q.    I would ask the witness be shown Mr. Martinez's

7    declaration, which I believe is in evidence.

8              THE COURT:  Well, you can show it to her.  It's

9    exhibit I.

10   Q.    If you could review, I believe it's about three pages,

11   that document and tell me when you're done?

12   A.    Review what pages now?

13   Q.    The entire thing.

14             THE COURT:  Come on Mr. Katz.  Direct her to what it

15   is you want.

16   A.    Ply thing kind of crapped out too.

17   Q.    What it is is what's not in it that's the problem.  What

18   it is is what's not in there I need the her to look at I?

19             THE COURT:  Why don't you just ask the question.

20   BY MR. KATZ:

21   Q.    Can you point to me wherein there Mr. Martinez testifies

22   that he met with Oasis prior to meeting with you?

23   A.    What am I looking for again.

24   Q.    Point to me which paragraph or paragraphs in this document

25   Mr. Martinez said that he met with Oasis prior to meeting with

center header

1  you?

2  A.   I don't remember reading that, seeing that anywhere.

3  Q.   Being HRAO being at it now, do you see.  In there?

4  A.   If you're asking me to read this I'm going to need a knew

5  minutes.

6          THE COURT:  Are you representing that that specific

7  statement is not in there Mr. Katz I accept that if that's your

8  representation.

9          MR. KATZ:  Yes.

10         THE COURT:  I'm not sure I'm not sure the point is.

11  Anyway it's not there.  There's nothing in there Mr. Oasis

12  first two weeks later Susan Wright is that what your question

13  is.

14  A.   Yes.

15         THE COURT:  Next question.  Snow that's all I have

16  your Honor.

17         THE COURT:  Since this is a non jury case, I'm

18  curious what's the relevance of that so I understand.

19         MR. KATZ:  The relevance is she testified prior she

20  knew this and the only way she would know it from today that

21  she did not witness because she was not in the room and she

22  said neither the other three people who are on her behalf spoke

23  to her about a Mr. Martinez testimony.

24         THE COURT:  I'm mystified.  You asked the questions

25  that Mr. Katz is referring.

Angela O'Donnell, RPR, 914-390-4025

center header

1              MS. WRIGHT:  My specific question was.

2              THE COURT:  Tell 3450E what it was.

3              MS. WRIGHT:  Are you aware he is saying he met with

4    you on the 26th which was two weeks after up to two weeks after

5    the Oasis folks were there.  I didn't say anything about where

6    that information came from.

7              MR. KATZ:  She said I believe the question was that

8    Mr. Martinez alleges that he met with you two weeks after he

9    met with Oasis.

10             MS. WRIGHT:  On the 24th 26th I specifically

11   referenced the 26th you can read back my question.

12             MR. KATZ:  I TKPWA*ED guess we need to read back the

13   question STKPWRAO I'm still confused.

14             THE COURT:  Hold on, Mr. Katz.  I'm confused I want

15   to deconfuse myself.

16             You asked the question.  You have notes, so you

17   probably know what your question was.

18             MS. WRIGHT:  Yes.

19             THE COURT:  You asked the question about this

20   differential in timeframe, I don't remember what the question

21   was.  The answer, I believe was that Susan Wright was aware

22   that Mr. Martinez is saying, in some way, that he met with her

23   on the 26th approximately two weeks after he met with Oasis.

24             Was that gist of your question?

25             MS. WRIGHT:  My question had to do with what you said

                    Angela O'Donnell, RPR, 914-390-4025

center header

 1   and I can't recall if her response was that she's aware that

 2   he's saying he met with her on the 26th.  I don't remember what

 3   her complete answer was.  But my question specifically

 4   incorporated the 26th and 2 weeks after -- at least --

 5              THE WITNESS:  The two weeks threw me off.

 6              THE COURT:  Wait, Susan Wright, please.

 7              Nancy Wright has got the floor right now.

 8              MS. WRIGHT:  I don't know if I said at least two

 9   weeks, but there was a reference to the two-week time period I

10   remember you asked me if he said that and I said yes.  He said

11   it was at least a week, maybe more after.

12              THE COURT:  After what?

13              MS. WRIGHT:  After meeting with Oasis that he met

14   with Susanne and that it was on the 26th -- Susan, and that it

15   was on September 26th.  And I can't remember how I phrased it.

16              THE COURT:  Honestly, I still don't get it.  I really

17   don't.

18              MR. KATZ:  May I just --

19              THE COURT:  I don't.  Sorry, but go ahead.

20              MR. KATZ:  I believe the question related to whether

21   Mr. Martinez claimed he met with Ms. Wright on the stand, the

22   witness, two weeks after he met with Oasis.  She claimed

23   Ms. Wright, Susan Wright, claimed that she was aware that he

24   claims that.

25              THE COURT:  Let's clarify that.  Do you --

                  Angela O'Donnell, RPR, 914-390-4025

center header

1           THE WITNESS:  I'm confused.

2           THE COURT:  Maybe there was some lack of

3    clarification.

4           But are you aware that Mr. Martinez is claiming, this

5    is a loaded question because I don't know what you're aware of,

6    but are you aware that Mr. Martinez is claiming?  I'm not

7    saying that he is claiming this, so are you aware that

8    Mr. Martinez is claiming that he met with you two weeks after

9    he met with Oasis?

10          THE WITNESS:  I was not aware of that.

11          THE COURT:  I'm still not sure what you're referring

12   to, Mr. Katz.  I apologize.  I just don't.  I'm missing it.

13   I'm not saying you don't have it.  I just -- I don't have it.

14          MR. KATZ:  To me that's a different answer than what

15   she said before and what she said before --

16          THE WITNESS:  I'm only aware --

17          THE COURT:  Witness Wright, please.  Hold on a

18   second.

19          MR. KATZ:  This answer would not have led to those

20   questions.  The answer help gave before he was aware he was

21   claiming that.  It's -T no near declaration.  She said she did

22   not speak to these employee information.  We calls into

23   credibility what happened in the interim.  How is he Sixty

24   Zukor wear of those claims if these lying now saying they did

25   not speak or she answered what ever she thinks were attorney is

center header

1   asking her.

2          THE COURT:  What did Mr. Martinez say to direct about

3   this.  Of.

4          MR. KATZ:  He said he met with Oasis and depending

5   which question after that at least two weeks after he met with

6   Ms. Wright.

7          THE COURT:  My notes say that he doesn't remember the

8   date of meeting with Ms. Wright, meaning Susan Wright but it

9   was more than one week and more or less two weeks later.

10         MS. WRIGHT:  He said.

11         THE COURT:  Later meaning later after he met with

12  Oasis.

13         MS. WRIGHT:  Yes and we refreshed his recollection he

14  said he met with Susan on the 26th.  I incorporated that date

15  into the question I asked her using the declaration.

16         THE COURT:  But the declaration doesn't say anything

17  about this advertise distinction between meeting with Oasis

18  and --

19         MS. WRIGHT:  The declaration says his meeting with

20  Susan occurred on the 26th and that's the part of it that I

21  incorporated which would have meant that the meeting with Oasis

22  would have been two weeks before the 26th.

23         THE COURT:  All right any event, Ms. Wright.  Just so

24  we get KWROURTS answer clearly, did you speak to either your

25  attorneys or I should say Paramount's attorneys or to Mr. Black

center header

1    before you testified today about what Mr. Martinez testified

2    to?

3              THE WITNESS:  I saw his declaration.

4              THE COURT:  I'm talking about his testimony today

5    here.

6              THE WITNESS:  , on *E oh, no, no.

7              THE COURT:  Definite MRI did not.

8              THE WITNESS:  Definitely did not.

9              THE COURT:  Didn't speak to Ms. Wright, meaning

10   Attorney Wright and didn't speak to Mr. Black.

11             THE WITNESS:  Nope.

12             THE COURT:  Good, we got your clear answer and

13   obviously I'm the finder of fact, so I'll decide whether it's

14   credible or not.

15             Anyway.  I think you were.

16             MR. KATZ:  I had no further questions after that.

17             THE COURT:  That's the only question you have.

18             MR. KATZ:  Yes.

19             THE COURT:  All right.  Any redirect.

20             MS. WRIGHT:  None your Honor.

21             THE COURT:  Okay, thank you very much ma'am you can

22   step down.

23             THE WITNESS:  I'm done.

24             MS. WRIGHT:  Yes.

25             THE COURT:  Yes you are.

                 Angela O'Donnell, RPR, 914-390-4025

center header

1              THE WITNESS:  Thank you for the glasses.

2              THE CLERK:  You're welcome.

3              THE COURT:  You can stay in the courtroom or leave

4    it's entirely up to you.  Witness excused).

5              THE COURT:  Let's see it's quarter to one.  You have

6    one more witness, I think.  Right.

7              MS. WRIGHT:  Yes, your Honor.

8              THE COURT:  How long do you think the witness is

9    going to take.

10             MS. WRIGHT:  Probably the staple.  Twenty minutes,

11   not more.

12             THE COURT:  Well that's good, but I think we're going

13   to have to take a break.  I actually have a lunch engagement

14   and you know we're doing fine but I think we're going to have

15   to take a break, in a per if he can world we would finish,

16   we're going to break until 215.

17             MS. WRIGHT:  Okay.

18             THE COURT:  We have something.

19             THE COURT:  That should work, I have something else I

20   have to do at 330 in court another matter so if we reconvene at

21   215.

22             THE CLERK:  Judge let me check the time.  I have

23   something at 330.  I think if we recon cleaned at 215.  Let's

24   make it 230.  Okay?  I'm sorry I just got so many different

25   things going on.  We'll reconvene at 230.  We have one more

              Angela O'Donnell, RPR, 914-390-4025

center header

1   witness and we're done.  Right.

2            MS. WRIGHT:  Yes, your Honor.

3            THE COURT:  Excellent.  Anybody need to raise

4   anything before we break for lunch you can raise it later.  I'm

5   not precluding you for all time.

6            MR. KATZ:  No, your Honor.

7            MS. WRIGHT:  No, your Honor.

8            THE COURT:  I'll see you at 2:30.

9            THE CLERK:  All rise this court will be in recess.

10           (Luncheon recess taken)

11           (afternoon session).

12           THE CLERK:  All rise.

13           THE COURT:  Have a seat everybody.  Ms. Wright you

14   ready to proceed.

15           MR. KATZ:  I am your Honor.  At this time I call tar

16   even Cabrera ban to the stand.

17    witness            , having been previously duly sworn,

18   testified further as follows:

19           THE CLERK:  Please be seated.  Please state your full

20   name for the record.  Spelling your fist and last name.

21           THE WITNESS:  Tar even Cabrera ban cool I.  T A R Y

22   N, C A, B A N hi feign, COO L E Y.

23           MR. KATZ:  Thank you.

24   DIRECT EXAMINATION

25

center header

1  BY MR. KATZ:

2  Q.    Ms. Cab cab where are you employed?

3  A.    Oasis, a paychecks company.

4  Q.    What is your current position?

5  A.    I'm in implementation and benefits consultant.

6  Q.    What do you do in that role?

7  A.    I conduct on-site employee orientations, I'm also a

8  licensed benefit consultant, so I assist for on boarding for

9  payroll as well as benefit administration for the benefits we

10 offer as a company.

11 Q.    And back in September of 2016, what was your role at

12 Oasis?

13 A.    An implementation and benefits consultant.

14 Q.    And your duties were the same as you just described.

15 Correct.

16 Q.    Do you recall doing on boarding for a company called

17 Paramount Country Club?

18 A.    Yes.

19 Q.    Do you recall when specifically that on boarding occurred?

20 A.    September 23, 2016, as well as September 26, 2016.

21 Q.    Were those the only two days you were on-site at Paramount

22 Country Club which I will call PC C doing on boarding?

23 A.    Yes, ma'am.

24 Q.    And was there anyone with you at the time?

25 A.    I had a colleague, her name was Helen as is he SRAEU dough

center header

1   and she was a bilingual implementation and TOEFPLT AOEUFRPLTS

2   consultant.

3   Q.   Helen?

4   A.   Helen as is he SRAEU dough.

5   Q.   WAT KWROS you are role during that on boarding to?

6   A.   I was the lead implementation and benefits consult taken

7   and she was thereto just to support me as a bilingual and

8   benefits consult TAPLT.

9             THE COURT:  What language.

10  A.   Spanish.

11            THE COURT:  And English.

12            THE WITNESS:  And English, yes, sir.

13  BY MR. KATZ:

14  Q.   Prior to the September 23, were you -- I'm sorry?

15  A.   She offered me water.  I'm sorry.

16  Q.   All right I'll wait until you?

17  A.   No go ahead.

18  Q.   Tell me what time did you start the on boarding at PC C on

19  the 23?

20  A.   I'm going to approximate -- like 9:00 a.m.

21  Q.   Okay?

22  A.   It was there the etch tire day it probably did not end

23  until six, 630 -FPT.

24  Q.   Walk us through the on boarding you did at PC KR-FRPBLTS

25  okay, so when I arrive.  We normally arrive about a half hour

Angela O'Donnell, RPR, 914-390-4025

center header

1    early to go ahead and set up the computers for the employees to

2    go ahead and sit at their own computer to do the on boarding.

3    I normally go ahead and set it up and then I went to another

4    location, I believe it was the dining room, I don't know the

5    formal name of the room that I conducted the actual employee

6    meeting for employees that were eligible for medical benefits.

7    So during that time all full time eligible management were in

8    attendance during that meeting where I explained to them what

9    their benefit offerings were.  After the meetings, after that

10   meeting concluded, we went down to the room that myself and my

11   colleague where we set up the computers for the employees to

12   come in on a rotating basis for them to sit at the computer to

13   do their on boarding and the on boarding process is about a 15

14   minute process to where they have to go ahead and enter

15   information that is specific to PC C as well as their

16   demographic information.  Social Security?

17          THE COURT:  Ms. Cab cab, can you slow down.  Because

18   I have to understand.  You know what you're talking about.  She

19   flows what you're talking about.  They know what you're talking

20   about.  I don't know what you're talking about at all.

21          THE WITNESS:  Yes.

22          THE COURT:  Okay?  Slow down.

23          THE WITNESS:  Okay.

24          THE COURT:  All right.  Let's see I interrupted you,

25   you were saying, you first had this meeting first you went to

center header

1    the room where the computers were sent up.  And then you went

2    to a different room and went to a meeting with employees about

3    feign PWEULGTS.

4                    THE WITNESS:  Yes.

5                    THE COURT:  And you went back to the room where the

6    computers were and arranged for the employees to come in one at

7    a time to sit at a computer and do their on boarding.  That's

8    one of those words on boarding I don't think I ever learned

9    that word before.  Anyway, on boarding which is about a 15

10   minute process in which they go ahead and enter information

11   that is specific to PC C, meaning the country club, as well as

12   their demographic information and that's where I cut you off.

13                   THE WITNESS:  Okay.

14                   THE COURT:  Sorry about THAFPLT.

15                   THE WITNESS:  No that's okay.

16                   THE COURT:  Slow down.

17                   THE WITNESS:  I sure will.

18   BY MR. KATZ:

19   Q.    Let's take a step back, so the first meeting that you held

20   with the employees was to do what?

21   A.    The first meeting was in the dining room, I believe that's

22   what it was, for me to go ahead and discuss with them their

23   benefits.

24   Q.    Okay?

25   A.    Okay.

Angela O'Donnell, RPR, 914-390-4025

center header

1   Q.   Was Ms. SRAEUD SRAEUD with you at the time?

2   A.   I don't not recall, I believe so.

3   Q.   Did you meet with all employees at that time or only the

4   employees who qualified for benefits?

5   A.   Only the employees that qualified for benefits.

6   Q.   Did the employees fill out any forms at that time?

7   A.   During the day, not that time specifically.

8   Q.   So what was the purpose of just that meeting?

9   A.   To discuss the on boarding as far as what the employees

10  were going to go ahead and do when we returned to the room

11  where the computers were set up.

12  Q.   Okay, how many computers did you have set up in the on

13  boarding room?

14  A.   It was about eight.

15  Q.   We use the term on boarding, what did the on boarding

16  process entail?

17  A.   Okay, so the on boarding process is a 15 minute process to

18  where each employee would go ahead and enter a client ID number

19  specific to that client.

20        THE COURT:  Hold on stop, the client is the employer.

21        THE WITNESS:  Correct.

22  A.   So the client was Paramount Country Club and we have a

23  client ID that is specify being to Paramount as well as an

24  employer pin, the employ would enter their Social Security

25  number twice as well as their name, full name.  Then it would

center header

1   proceed to go into additional information, their demographic

2   address, birth date, telephone number, federal, state

3   withholding, direct deposit information, their emergency

4   contact, if they wished to enter their driver's license.  Their

5   citizenship status, so if they were a citizen or if they were a

6   legal resident of the United States, this is where we would

7   capture that information.  During that process was also the

8   employee APBLG -PLT form which has the information regarding

9   the arbitration.

10  Q.   Okay?

11  A.   There's also, again, the voluntary EEO form, which is you

12  know stating your gender as well as your ethnicity and if

13  you're a veteran or former or current member of the US armed

14  forces the other section of our on boarding process was whether

15  or not you would like to receive information from us via mail

16  or electronically.

17  Q.   During this process, how would you -- how did you on

18  board -- well, let me take a step back.

19       Were there employees at Paramount that you on boarded that

20  did not speak English?

21  A.   Yes.

22  Q.   What allowances were made to unboard those employees, if

23  any?

24  A.   Each employee has to sit at a computer so we work the

25  room, both myself as well as Helen SRA*EUD, I'd work with

center header

1   anybody that was English speaking I would tend to them, if they

2   had any questions regarding the process and legal even was

3   there to assist with anyone that did not understand me in

4   English, but the on boarding process has the offering if you

5   are not comfortable with doing it in English they can have it

6   translated to them in Spanish.  The electronic on boarding

7   process.

8   Q.    When you say they could have it translated, where on the

9   screen was that option?

10  A.    It's on the very first page.  The very first screen.

11  Q.    So they can do the on boarding actually in Spanish?

12  A.    Correct.

13          THE COURT:  Stop you right there.  So there's

14  actually a button you would push if you want it in Spanish you

15  click that button and the rest of it is all in Spanish.

16          THE WITNESS:  Correct.

17          THE COURT:  It's a completely identical process but

18  written in Spanish.

19          THE WITNESS:  Correct.

20  BY MR. KATZ:

21  Q.    Do you recall if the on boarding that you did on the 26th

22  was similar to the one that you did on the TWEPBT third in

23  terms of the procedure?

24  A.    Yes.

25  Q.    And do you recall when, which date you had the benefits,

center header

1   the actual benefits meeting that you mentioned earlier?

2   A.   Friday the TWEPBT third.

3   Q.   Did you have anything else to do with benefits on the

4   26th?

5   A.   No.

6   Q.   Did you at any point after the actual on boarding then

7   meet with those employees that qualified for benefits?

8   A.   If they wished torques I would do a follow up, an

9   individual follow up.   (.

10  Q.   During the on boarding, do you recall any employees

11  telling you specifically that they needed assistance with

12  completing the process?

13  A.   On boarding or benefits?

14  Q.   On boarding.

15  A.   On boarding?  I'm sorry that I'm going to ask a question.

16  Do you mean like just a question regarding the process itself?

17  There were employees that had questions.

18  Q.   How would you deal with KWEUR RAOES when employees had

19  them during the on boarding process?

20  A.   I would answer them to my best -- you cannot advise or --

21  say for instance during them entering their federal or state

22  income tax, you can not advise because I'm not a certified

23  public accountant, but if they needed an explanation I would

24  explain to them as to what this form during the on boarding

25  process was for.

Angela O'Donnell, RPR, 914-390-4025

center header

1    Q.   At any point during the process did you physical assist as

2    in input any information for any of the employees that you're

3    on boarding?

4    A.   No, ma'am.

5    Q.   Did Ms. SRA*EUD who was your colleague physically input

6    any information for any of the employees?

7    A.   No, ma'am.

8              MR. KATZ:  Objection to foundation or hearsay.  How

9    would she know.

10             THE COURT:  Well, you could probably lay a better

11   foundation for that, Ms. Wright.

12             MR. KATZ:  Sure.

13   BY MR. KATZ:

14   Q.   Was there any time period during the on boarding process

15   when you were not present in the room?

16   A.   If I had to use the restroom.

17   Q.   Okay?

18   A.   That was the only other time.

19   Q.   Do you recall specifically whether or not you left to use

20   the restroom on the TWEPBT third for instance?

21   A.   Yes.

22   Q.   How long did that last, that trip?

23   A.   Five minutes.

24   Q.   During the time periods when you were not in the room, who

25   else was in the room conducting the on boarding?

Angela O'Donnell, RPR, 914-390-4025

center header

1   A.    Helen, but \formerly\formally it was when other employees

2   were not in the room on boarding, we were present both.

3   Q.    I'm not sure I understand?

4   A.    I'm sorry it was both myself and legal even in the room.

5   Q.    On the occasions you used the restroom I'm trying to find

6   out were employees in the room when you took breaks to use the

7   restroom?

8   A.    No.

9   Q.    During the entirety of the actual on boarding process you

10  were present physically present for every portion of it when

11  employees were in the room?

12  A.    Correct.

13  Q.    During that process, did you observe Ms. SRA*EUD inputting

14  any information on behalf of any employee?

15  A.    No, ma'am.

16  Q.    Do you know who Susan Wright is?

17  A.    Yes.

18  Q.    And was she present for any portion of the on boarding?

19  A.    Why he is.

20  Q.    For all of it or most of it or how would you describe it?

21  A.    Most of it.  Most of it.  It was a giant room.  We shared

22  the room so where I was set up and her work space is in the

23  same vicinity.

24  Q.    Okay.  During the on boarding process, did you observe

25  Ms. Wright physically inputting information for any of the PC C

center header

1    employees that you're on boarding?

2    A.   No, ma'am.

3    Q.   You mentioned that there was forms that the employees

4    would have to sign during the process and I think you referred

5    to one of them as the employee agreement, acknowledgment form.

6    Did the employees also have the option of reviewing that form

7    in English or Spanish?

8    A.   Correct.

9    Q.   And could employees PC C employees complete the on

10   boarding process without electronically executing that the

11   form?

12   A.   No.

13   Q.   Why not?

14   A.   Our process is to where each screen you have to complete

15   that form before you move on to the next form.  If you do not

16   complete the required field which everything every part of the

17   on boarding process is required it will not allow you to move

18   forward, and if you were to not complete something and say move

19   on to another screen it will suspend the transaction.

20   Q.   Did that occur at any time that you were at PC C during

21   the on board -RG on the 23 and on the 26th?

22   A.   No.

23   Q.   Did any employees indicate to you that they did not want

24   to execute the employee acknowledgment form during the time

25   period that you were there?

center header

1   A.   No.

2   Q.   What if anything happens to that form once it's executed?

3   A.   It is an electronic form so if anybody wanted to revisit

4   it it would be available for TKPARB dash it's on their employee

5   record.

6   Q.   Prior to coming here today, did you review any documents

7   that were submitted on behalf of Mr. Mr. Martinez during the on

8   boarding?

9   A.   I reviews the his benefit enrollment form, also I just

10  went through his personnel -- to see the forms he did complete

11  during the on boarding.

12  Q.   Did you see whether or not there was an executed

13  employment acknowledgment form on behalf of Mr. Martinez?

14  A.   Yes, ma'am.

15  Q.   And was that form electronically executed?

16  A.   Yes, ma'am.

17  Q.   I'm going to ask you to take a look at what has been

18  marked as Exhibit A, I think it's up there?

19  A.   Yes.

20  Q.   And do you recognize that document?

21  A.   I do.

22  Q.   And is that the form it says employee acknowledgment that

23  you saw on behalf of Marco Martinez?

24  A.   Yes, ma'am.

25  Q.   What is it dated?

Angela O'Donnell, RPR, 914-390-4025

center header

1    A.   This is dated September 26, 2016.

2    Q.   Do you have any recollection of meeting Mr. Martinez, you

3    mentioned that he filled out a benefits enrollment form that

4    you saw one for him.  You have to say it you're nodding?

5    A.   I have no recollection of meeting Mr. Martinez.

6    Q.   The benefits enrollment form that you indicated that you

7    saw that he had completed, was that also a part of the on

8    boarding or something separate?

9    A.   Something separate.

10   Q.   Were you involved in that as well?

11   A.   Yes.

12   Q.   At what stage in relation to the on boarding did that

13   process take place?

14   A.   The benefit enrollment form comes after the on boarding is

15   completed so the forms come to me and I complete them, I review

16   them and then I submit them for processing.

17   Q.   When you say you complete them, you're the one who fills

18   them out?

19   A.   No, I'm sorry I review them to make sure they're

20   completed, excuse me, I'm sorry.

21   Q.   Just want to PHEUBG sure I understand if process

22   correctly.  So you have the on boarding let's say on the 26th.

23   After the on boarding is finish THR-D's a separate meeting held

24   where employees fill out benefit enrollment TPORLS?

25   A.   No, they all go ahead and do the on boarding which is the

center header

1   payroll portion.

2   Q.   Yes?

3   A.   Then the enrollment form for their benefits would be

4   handed to myself and I would review it for completion, I would

5   take that with me and I would submit it to my processing

6   department so that way they can go ahead and update our

7   carriers.

8        Q    (By The Court) I guess the question is

9   when were those -- not on the on boarding but the

10  employee benefits form, benefit enrollment form,

11  when is that filled out by the employee?  When does

12  that happen?

13  A.   Why does that happen.

14          THE COURT:  When.

15          THE WITNESS:  That actually happened on September 26.

16          THE COURT:  But before or after on boarding?

17          THE WITNESS:  After on boarding.

18          THE COURT:  When did they get the forms?  When did

19  someone say here's the form.

20  A.   On the 23.

21          THE COURT:  That was that first meeting you talked

22  about.

23          THE WITNESS:  Correct.

24          THE COURT:  At the first meeting with all the people

25  eligible for benefits they all come in, they're there for the

center header

1    meeting, they get the forms and you tell them, well you're

2    eligible for health or eligible for dental whatever the case

3    may be?

4             THE WITNESS:  Correct.

5             THE COURT:  Right?

6             THE WITNESS:  Yes.

7             THE COURT:  They give you the form after the on

8    boarding.

9             THE WITNESS:  Correct.

10             THE COURT:  Whenever it is they do the on boarding.

11             THE WITNESS:  Correct.

12             THE COURT:  Approximate the person did the on

13    boarding on the 23 you would get the form on the 23.

14             THE WITNESS:  Correct.

15             THE COURT:  But if the person did the on boarding on

16    the 26th.  Meaning at the computer.

17             THE WITNESS:  Correct.

18             THE COURT:  You'd get the form on the 26th.

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.

21             MR. KATZ:  Thank you.

22    BY MR. KATZ:

23    Q.   What type of information was on the benefit enrollment

24    form?

25    A.   On the benefit enrollment form it's demographic

                    Angela O'Donnell, RPR, 914-390-4025

center header

1    information, name, Social Security number, date of birth,

2    county in which you live, the effective date of the benefits,

3    the benefits that they're electing for medical, dental, vision

4    and any kind of dependent information as well as beneficiary

5    information and signature and date.

6    Q.    And that form was in English or Spanish?

7    A.    The form from Mr. Martinez?

8    Q.    Yes?

9    A.    Was English.

10   Q.    Do you recall approximately how many employees completed

11   benefit enrollment forms on the 26th, approximately?

12   A.    Approximately 20.

13   Q.    So it wasn't all the employees that would have qualified?

14   A.    Correct.

15   Q.    Do you have any recollection of Mr. Martinez himself

16   specifically during the on rolling process?

17   A.    No, ma'am.

18   Q.    Do you recall any employee during the on rolling -- sorry,

19   I'm going to take that back.

20         Do you recall any PC C employee on the 26th when you were

21   doing on the rolling -- on boarding complaining of other

22   employees filling out or inputting on boarding information --

23   A.    No, ma'am.

24   Q.    Did you see any incidents or occasions where that

25   occurred?

center header

1    A.   No, ma'am.

2              THE COURT:  Hold on a second.  Where what occurred?

3              MR. KATZ:  Where someone inputted information for

4    another employee during the on boarding question -FLT.

5              THE COURT:  Your question was I imprecise, the first

6    question was do you recall any employee complaining.

7    Q.   Yes?

8              THE COURT:  And you said did you see any indents

9    where that happened.ful meaning complaining.  That's not what I

10   meant.

11             MR. KATZ:  No.

12             THE COURT:  The question was, did you ever see a

13   situation when you were there on the 26th of September where

14   someone inputted information in the in boarding process for is

15   a employee?

16             THE WITNESS:  No.

17             MR. KATZ:  That was my question, much better question

18   and I'll adopt it.  Did you.

19   A.   No.

20   Q.   Observe that?

21        The on boarding question once it's completed what then

22   happens to the portal?  Do they log off?  What do the employees

23   do once they're done?

24   A.   So once it's completed they come to a screen saying that

25   the employee portion of the on boarding had been completed,

center header

1    they get an email, not an email, it's a system generated

2    screen, they can either print or email themselves a copy of of

3    the completion notification.

4    Q.   Okay?

5    A.   And then Susan or Mr. Black would go ahead and receive

6    notification as well that that employee had received the on

7    boarding and they would complete the manager portion of the on

8    boarding and that is just the bit of information that they

9    would enter as far as the employ why ye's pay rate, if -- their

10   job title and their start date.

11   Q.   The computers that the employees were using for the on

12   boarding, who owned those computers, were those PC C computers

13   or Oasis computers?

14   A.   Oasis.

15   Q.   And once the on boarding process the completed by an

16   employee, can that employee go back in and change whatever

17   information they had submitted?

18   A.   No.

19   Q.   Why not?

20   A.   Because that information has now transmitted over to our

21   payroll system and in order for any kind of changes to take

22   effect I, myself, or someone on my team would have to delete

23   the record completely.

24   Q.   Similarly, once the employee completes the on boarding

25   process, would any PC C employee, including Susan, be able to

center header

 1  go in and change or add to what was submitted?

 2  A.   No.

 3  Q.   Why not?

 4  A.   The information is saved, therefore there is no changes

 5  that can be made on the system.

 6  Q.   What would stop such a change?

 7  A.   What would stop KPWARB -- the system does not allow allow

 8  for anyone.  Once the employee had completed their portion of

 9  the on boarding it's completely done.  You cannot go back.

10  Q.   Can Oasis go bark and make changes to an individual

11  employee's on boarding information?

12  A.   No, ma'am.

13  Q.   What's the reason for that?

14  A.   We are compliant, and the system will just not allow.

15           MR. KATZ:  I have no further questions at this time,

16  your Honor.

17           THE COURT:  Mr. Katz, one second.  I just want to get

18  some clarification on one thing.

19           THE WITNESS:  Sure.

20           THE COURT:  You said that there was a button or

21  something in the on boarding screens that you're looking at

22  that would allow you to switch from English to Spanish.

23  A.   Yes.

24           THE COURT:  Where is that and how is that done,

25  exactly.

                Angela O'Donnell, RPR, 914-390-4025

center header

1  A.   It's on the very first screen of our on boarding, so our

2  very -- we have a home page for the on boarding and on that

3  very first page where you're entering your Social Security

4  number and that client specific ID number with your name, first

5  name, last name, Social Security number twice, right below it

6  it asks if you want to go ahead and continue this in -- if you

7  want it to be done in Spanish.

8           THE COURT:  Is that question asked in English or in

9  Spanish?

10          THE WITNESS:  It's in evenings -- it's actually in

11  English and in Spanish.  So it will say in he is span KWROEL.

12  It does say English actually it's in Spanish I apologize.  I'm

13  sorry I'm trying to -- but it is in Spanish.

14          THE COURT:  Do you have that screen?

15          MR. KATZ:  Yes, your Honor, for what it's worthy do

16  have -- I didn't exchange it as an exhibit but I can give

17  copies I have the whole print out of exactly.

18          THE COURT:  I'd like the see it.  Since I'm the fact

19  finder I'd like to see it.

20          MR. KATZ:  May I approach.

21          MR. KATZ:  Your Honor for the record I would just

22  object that none of this was produced to us prior to right now.

23          THE COURT:  You've never seen this before?

24          MR. KATZ:  No.

25          THE COURT:  Well you're going to get it right now.

Angela O'Donnell, RPR, 914-390-4025

center header

1   You do have exhibits G and H.  It's not in there Ms. Wright.

2            MR. KATZ:  It was given -- we intend to use this as

3   an exhibit but I had it for reference just in case it was

4   needed.

5            THE COURT:  Back to G and H.  What you just gave me

6   is not included in G and H.

7            MR. KATZ:  That's H, your Honor.  That is H.

8            THE COURT:  It is H.

9            MR. KATZ:  I I never received the exhibits G or H.

10  Today or prior to today.

11           THE COURT:  I received it.  I didn't have it before,

12  then I do have it and you handed it up to my -- wait a minute.

13  G and H you've never seen?  How do you even know THAFPLT do you

14  have them now?

15           MR. KATZ:  Well, I still have they still have not

16  given G and H to me.

17           THE COURT:  You haven't given them G and H.

18           MR. KATZ:  No, your Honor I did not distribute G and

19  H because I was not planning to use them.  Even though it was

20  in the exhibit package I just handed it to him right TPHROU.

21           THE COURT:  You handed H to him.

22           MR. KATZ:  Yes, your Honor.

23           MR. KATZ:  I still have not seen G.

24           THE COURT:  We don't really care about G.  She's not

25  using G.  She's talking about H.  Let's focus on.  Had.  She

Angela O'Donnell, RPR, 914-390-4025

center header

 1 │ just handed you H for identification.  The first page of which
 2 │ just so we're all talking about the same thing, it says E O B
 3 │ local employee on boarding, what is E O B.
 4 │           THE WITNESS:  Electronic on boarding.
 5 │           MR. KATZ:  I have an extra copy your Honor if you
 6 │ need it.
 7 │           THE COURT:  Well we might, given to the witness, you
 8 │ might as well.  First let me look at it.
 9 │           MR. KATZ:  I would like for the record to be clear we
10 │ object to the exhibit since it was TPHEFRD provided prior to
11 │ the hearing as required by the Court.
12 │           THE COURT:  I'm KUR gross why you don't.  Not sure
13 │ you're going to use it it PHAOEPS you might use.  If you might
14 │ uses you should provide it.  If you don't use it.
15 │           MR. KATZ:  I didn't even flow it existed until we
16 │ started speaking with tar inand heard there's a print out that
17 │ we could have gotten with the actual steps so we got it, I
18 │ think maybe a week ago.
19 │           THE COURT:  Okay a week ago, so you could have given
20 │ it to Mr. Katz a week ago, you could have.
21 │           MR. KATZ:  I wasn't sure I WALGS going to need to.
22 │           THE COURT:  I know that, but when you say you're not
23 │ sure, the implication means the implication is you might and if
24 │ you might that's enough of a reason to turn it over so that we
25 │ don't have this objection.

center header

1              MR. KATZ:  Absolutely, your Honor.

2              THE COURT:  Well we're going to make a record in any

3       event.  This is exhibit H.  You have in in front of you now

4       Ms. Cabrera ban.

5       A.   Yes, sir.

6              THE COURT:  It says E O B local employee on boarding.

7              THE WITNESS:  Correct.

8              THE COURT:  We're TKPWO*EG to call it exhibit H for

9       identification, hasn't been received in evidence yet.  I just

10      WRAPBT you to tell me what this is.  What is H?  I just read

11      the at this time too will I want you to explain.

12             THE WITNESS:  I didn't know if you meant it to me or

13      Ms. Wright.

14             THE COURT:  To you.

15             THE WITNESS:  I apologize.  This is the very first

16      screen of our electronic on boarding, so this is the screen

17      where the employee would need to go ahead and enter the

18      employer ID number, this is specific for each of our clients so

19      paramount would have had their own specific client ID number.

20             THE COURT:  How does the employee know the client ID

21      number?

22             THE WITNESS:  That is relayed to them.  So, prior to

23      me coming on-site I go ahead and forward information to my

24      point of contact at the client so in in case it would have been

25      Mr. Black as well as Susan and then the information was

center header

1   forwarded to the employees as well as when I do come on-site I

2   have another printout with the employer ID with the pin number.

3           THE COURT:  What's a pin number.

4           THE WITNESS:  A pin number is a system generated pin

5   number that is specific for each and every one of our clients

6   in order for them to access their on boarding.

7           THE COURT:  My only question; you said that the

8   employee inputs the client ID number and the pin number.

9           THE WITNESS:  Correct.

10          THE COURT:  In addition to Social Security number and

11  other stuff.

12          THE WITNESS:  Correct.

13          THE COURT:  Presumably they know their own Social

14  Security number.

15          THE WITNESS:  Correct.

16          THE COURT:  I'm trying to figure out how they know

17  the client number.  They're not the client they're the employee

18  of the client EUFRPBLTS I give it to them it's on paper while

19  I'm on cite with them.  It's also distributed via email.

20          THE COURT:  Somebody might not read their email.

21  They walk into the room they say okay.  There's a computer.

22  Have at it.  The first thing TE they need is the client number.

23  A.   Correct.

24          THE COURT:  They didn't do it EUFRPBLTS do you give

25  give that to them?

Angela O'Donnell, RPR, 914-390-4025

center header

1          THE WITNESS:  Yes, it is a print out.

2          THE COURT:  And be the pin number.

3          THE WITNESS:  And the pin number.

4          THE COURT:  Okay I any I interrupted you, I can't

5   remember when I did.  You were talking about the first page.

6          THE WITNESS:  So, with the information, because I go

7   ahead and present to them on a form with several copies on cite

8   the employee has the printout with the information, the

9   employer ID as well as the inputting number, each employees has

10  to go ahead and enter their first name, their last name as well

11  as their Social Security number twice and then it's going to go

12  ahead and ask for that security measure to make sure -LGTS

13  normally the cap KHA.

14          THE COURT:  The what.

15          THE WITNESS:  The security cap KHA.

16          THE WITNESS:  C A P T C H A.  It's basically I'm not

17  a robot.  And if they'd like to proceed in English, they would

18  click on next and if they'd like to proceed in Spanish they

19  would click on that pink screen to the left, the pink button

20  where it says in he is span KWROEL.

21          THE COURT:  There's a blue button for next and a pink

22  button for in he haves pan KWROEL.

23          THE WITNESS:  Correct.

24          THE COURT:  If you check on the he is span KWROEL

25  button everything else is in Spanish.

Angela O'Donnell, RPR, 914-390-4025

center header

1           THE WITNESS:  Correct.

2           THE COURT:  And during the orientation meetings this

3    is advised to the employees.

4           THE COURT:  In the what meeting?

5           THE WITNESS:  The orientation -- when I'm there to do

6    the on boarding.

7           THE COURT:  I'm sorry when is this meeting?

8           THE WITNESS:  On the 23 of September.

9           THE WITNESS:  But that's only with some employees.

10          THE WITNESS:  No that would have been with all of

11   them anybody that came into that room if they were Spanish

12   speaking, it was advised that they can go ahead and continue in

13   in Spanish.

14          THE COURT:  Okay, but I think you testified earlier

15   that that meeting that first meeting on the first day was only

16   with a handful of employees 20 employees or something not

17   everybody.

18          THE WITNESS:  That was the benefit meeting, but the

19   actual on boarding meeting, the benefit meeting is only for

20   eligible employees.

21          THE COURT:  I only thought there was one meeting now

22   you're telling me there's two meetings.

23          THE WITNESS:  Basically.

24          THE COURT:  Not basically.

25          THE WITNESS:  Sorry there's a first meeting with the

center header

1   employees.

2           THE COURT:  Which employees.

3           THE WITNESS:  The full time eligible medical eligible

4   employees.  And that was approximately 20 employees and then

5   there are meetings while we were in the room doing the on

6   boarding and explaining to them what they're doing during this

7   process.  And there's also an introduction to each employee

8   when they come into the room to do the on boarding what we are

9   actually doing.  I explained to them what the on boarding

10  process is.

11          THE COURT:  So you're saying before -- let's say on

12  the 23 there was this meeting with the full time employees that

13  were eligible for benefits.  Let's just say the actual on

14  boarding for any particular employee, whether it was one of

15  those people from the 23 or somebody else.  Let's say that's on

16  the 26th and on the 26th.  Before that person started the on

17  boarding process you would give them an explanation for what

18  they're doing?

19          THE WITNESS:  Yes.

20          THE COURT:  You wouldn't just point to the computer

21  close your eyes EUFRPBLTS no.

22          THE COURT:  What would you do I'll trying to figure

23  that out it's important to me.

24          THE WITNESS:  I understand.

25          THE COURT:  I walk in the door I'm an employee I'm

Angela O'Donnell, RPR, 914-390-4025

center header

1   wait I go in the hallway patiently.  I'm a little impatient

2   because I have to go back to work.  You say come in you're next

3   I walk in the door what happens next.

4           THE WITNESS:  You're coming in, I'm explaining to you

5   that you're going to go ahead and enter what I said here,

6   you're going to take the flier that I printed with the client

7   ID number as well as the pin, you're going to enter TPHA

8   information as well as your Social Security number, your name,

9   you're going to go ahead and let me know, do you need to have

10  this done in Spanish or are you okay with doing it in English

11  and dependent upon what ever it is that you're doing here,

12  we're going to go and go through the entire process and what

13  you're going to do is enter your address, your date of birth,

14  if you have an email address you're going to provide that to

15  me, you're going to go ahead and let me know how you file your

16  takes, are you single, are you married.  The number of anow

17  answer he is that you're withholding on a federal as well as

18  state level.  You're going to let me know your citizenship

19  status.  You're going to enter if you're a non US citizen

20  you're going to go ahead and enter whether it's an alien ID

21  number or another EUFRPLT D number.  You're also going to ahead

22  and enter your direct deposit information as well as your

23  emergency contact.  You're going to complete the employee

24  acknowledgment form, you're going to complete the EEO section

25  and whether or not you would like to receive information from

center header

1  Oasis electronically and once you've completed that, you're

2  going to click on the finish bar and it's going to bring you to

3  the on boarding completion screen.

4          THE COURT:  Okay are you sitting or is either you or

5  Helen sitting with each employee while they do this?  They go

6  through this 15 minute process.

7          THE WITNESS:  If there are questions were there --

8  I'm formerly standing because I'm working to see if anybody has

9  any questions so that way either myself or Helen can make it

10 over to that employee quickly.  But it's normally not sitting.

11 It's normally like a classroom setting, so if they have

12 questions we're there to assist.

13         THE COURT:  But you do need to talk to each one

14 individually.  Or do you talk to each individual employee.

15 Every individual employee to get them started EUFRPBLTS to get

16 them started.

17         THE COURT:  They have to have the ID number and pin

18 number.

19         THE WITNESS:  Correct.

20         THE COURT:  Which you give to them.

21         THE WITNESS:  Correct.

22         THE COURT:  And you're telling me again with every

23 single employee you tell them off the bat you can do this in

24 Spanish or English.

25         THE WITNESS:  Correct.

                Angela O'Donnell, RPR, 914-390-4025

center header

1          THE COURT:  Do you remember on those two days whether

2     some of the employees did the on boarding in Spanish?

3          THE WITNESS:  No, I cannot.

4          THE COURT:  Do you remember there were Spanish

5     speaking employees?

6          THE WITNESS:  Yes.

7          THE COURT:  Do you remember Ms. -- EUFRPBLT Helen.

8          THE COURT:  Helen SRA*EUD, assisting employees in

9     SPAEURPB with what ever it is they were doing or whatever

10    questions they had?

11         THE WITNESS:  Yes, why yes, sir.

12         THE COURT:  But again you have no particular

13    recollection of Mr. Martinez?

14         THE WITNESS:  No.

15         THE COURT:  One way or the other.

16         THE WITNESS:  No.

17         THE COURT:  All right well I guess this is all, we

18    still haven't really gotten to the question of whether to admit

19    this document into evidence.  You just received it today?  I'm

20    reluctant to receive it into evidence.  There's been testimony

21    about the on boarding process and the fact it can be done in

22    English or Spanish, whether the document is introduced in

23    evidence.  The document obviously would confirm that, because I

24    could see it right on the document, but if you really are

25    objecting to it, I'm not sure -- well I guess I'd want to hear.

center header

1   Are you objecting to it.  You you object you don't really like

2   to have it because it's going to hurt your case or objecting to

3   it because you didn't see it until today.

4          MR. KATZ:  It's fundamental fairness of we had an

5   order of all documents by June.

6          THE COURT:  I didn't hear you because you're

7   mumbling.

8          MR. KATZ:  Sorry we had an order all documents would

9   be exchanged by the middle of July, we've had two months since

10  then, I've never heard of this document till two minutes ago

11  when it was handed to plea.  We'd had to chance to review I

12  compare it with your clients of I the ask I he is why.  The if

13  we thought there was other discovery we needed prior to the

14  hearing.  When we met with your Honor, in June WAUPB of the

15  understanding of the parties was we didn't need discovery

16  because we knew the universe of what was going on.  This to a

17  large extent changes it.

18         THE COURT:  I don't think it changes it, it confirms,

19  it's corroborative evidence.  The absence of it, it can't be

20  that they're holding something back in order to surprise you

21  because this helps the defense, it hurts the defense.  Why

22  would they hold something back that's hurtful unless they

23  didn't know they had it.  What Ms. Wright told me we didn't

24  know we had it until a week ago.  Which means you knew a week

25  ago.  Doesn't mean you didn't know, it just means you didn't

center header

1   know until a week ago.I accept your statement.  You tell me it

2   was a week ago, I accept that.

3          MR. KATZ:  It was, your Honor.  I also point out the

4   information that's on this form was in all the Oasis

5   declarations which we submitted.  It basically walked through

6   the process just like this document.  What I didn't know was

7   that they could print off I'll call it a dummy document that

8   actually shows the process in real time rather than them

9   describing it as they did in their declaration.  So it's not a

10  surprise.

11         THE COURT:  This document doesn't apply, this is a

12  generic sort of I should say hype TH*ET call, HAEUPB I is the

13  employee, that's not an employee at PCP C.  Or PC C.

14         MR. KATZ:  No, your Honor it's a demo.

15         THE COURT:  It's a demographic mow.  So you're saying

16  you didn't know PWR the demographic PHROE, but you did provide

17  through the affidavits submitted in connection with the motion

18  the SES.

19         MR. KATZ:  Absolutely your Honor and it walked

20  through every single.  What the employee would do in every

21  screen including tar in's and crystal who we didn't bring in

22  because it overlapped.

23         THE COURT:  Who's crystal.

24         MR. KATZ:  That was the employee who had the HELTD

25  issue.

center header

1          THE COURT:  Who is she though.

2          MR. KATZ:  We works at Oasis, we wasn't there in

3     person but she oversaw the PRO STKPWRES.

4          THE COURT:  I'm going to sustain the objection.  I do

5     recall, I don't have the order in front of plea, I certainly

6     have a recollection of issuing an order saying whatever

7     documents you intend to use at this hearing or trial needed to

8     be produced by a particular date oh yeah I just TPOUPD it how

9     about that.  It's dated June twentieth and it says by July

10    twelfth, which obviously this is well past that.  By July

11    twelfth.  Each side shall produce to the other side copies of

12    all documents that will be offered in evidence except those for

13    impeachment, et cetera.  So, the objection is sustained, I

14    mean -- you didn't produce it.  I'm not criticizing you for not

15    producing it, because you didn't have it.  Therefore that's why

16    you didn't produce it.  The fact is you didn't produce it and

17    it seems to me it's TPAUPB fair, it is unfair to the plaintiff

18    to say, well, we didn't know we had it now we know we have it

19    so we're producing it now.  That's still late.  So I understand

20    why you're now saying you weren't sure whether you were going

21    to use it.  I think another way to say it is how could you

22    possibly use it you hadn't produce it in accordance with my

23    order.  The objection is sustained.  I don't know that it

24    matters that much.  Because the testimony is the testimony.

25    The document is not in evidence.  But that doesn't stop her

Angela O'Donnell, RPR, 914-390-4025

center header

1  from TEFLG *E testifying about the process or the other

2  witnesses from testifying about the process.  Any event.

3  Exhibit H is not received and I will not consider it as such.

4          Okay.  I think Ms. Wright had completed her

5  questioning although if there's anything you wanted in light of

6  my additional questions any additional yes you wanted to ask on

7  direct you're welcome to do so.

8          MR. KATZ:  I don't have any additional questions your

9  Honor.

10          THE COURT:  Mr. Katz.

11          MR. KATZ:  May I just have one second.

12          THE COURT:  I meant to ask about this before,

13  Ms. Wright.  See if you can help me with this.  On Exhibit A at

14  the very to much there's the client ID number filled in, do you

15  see that?  Do you have Exhibit A?

16          MR. KATZ:  Yes, your Honor.

17          THE COURT:  The employee acknowledgment TPORP.

18          MR. KATZ:  Yes, your Honor.

19          THE COURT:  This is the one with the E signature of

20  Mr. Martinez.

21          MR. KATZ:  Yes, your Honor.

22          THE COURT:  It has a client ID and next line says

23  employee ID and it's blank.

24          MR. KATZ:  Yes.

25          THE COURT:  What is that.  What is employee ID was

center header

1   that a part of this process or not a part of this PRO he is is.

2   What's the story with that.

3            MR. KATZ:  I can ask tar inmy understanding is Is not

4   a part of the PRO he is is.

5            THE COURT:  TPHRERDZ, that employees did not input an

6   employee ID in the Paramount Country Club on boarding process.

7            MR. KATZ:  I would prefer to STPRER TPAOEU with tar

8   inif you don't mind.

9            THE COURT:  Why don't you ask.

10  BY MR. KATZ:

11  Q.   Ms. Cab cab, was part of the bro SES was there an employee

12  ID the employee had to input?

13  A.   No.

14           THE COURT:  Any reason why you see Exhibit A.  What's

15  that doing there.

16           THE WITNESS:  That's actually just a generic form.

17  \formerly\formally an employee ID number is generated after the

18  on boarding is completed.

19           THE COURT:  It's blank in this.

20           THE WITNESS:  It is blank I could not answer to why

21  the sits system generates the employee ID on the top of that

22  form.

23           THE COURT:  That's not something that -- in other

24  words it would be blank for ever row employ he EUFRPBL correct.

25           THE COURT:  It's nothing special.

Angela O'Donnell, RPR, 914-390-4025

center header

1              THE WITNESS:  No there eave nothing SPERB.

2              THE COURT:  That was my question.

3              THE COURT:  Any further questions.

4              MR. KATZ:  No, your Honor.

5              THE COURT:  KWROS.

6              MR. KATZ:  We have nothing your Honor.

7              THE COURT:  No questions.  Okay you may step down.

8              (Witness excused)

9              THE COURT:  I think the exhibits are A through F plus

10   I.

11             MR. KATZ:  Yes, your Honor.

12             THE COURT:  Anything further that either side wants

13   plea to consider or see or review?  I'm not going to decide

14   right at this moment I want to make sure the record is

15   complete.  I have the underlying motion that's all part of the

16   record, I now have the testimony of the four witnesses I now

17   have the exhibits offered in evidence.  Is there anything else

18   in *EU in addition to those things.

19             MR. KATZ:  Evidentiary wise no.  I would ask if the

20   court would allow for a short summation I'd be hope 20 doing

21   that.

22             THE COURT:  You'd like to do that now.

23             MR. KATZ:  Yes.

24             THE COURT:  Why don't you go ahead and do that.

25             MR. KATZ:  So, your Honor.  The testimony of four

center header

1  witnesses here today.

2         THE COURT:  Do me a favor stand at the Paul E.

3  Davison yum.  I'm not criticizing you, you know what I'm

4  talking about.  You tend to enunciate as well as some people

5  might.  It's a big room I've got to hear you, otherwise what

6  good -- it's terrible.  Go ahead.

7         MR. KATZ:  There's been some testimony from four

8  witnesses today.  None of the testimony has indicated that

9  anyone saw Mr. Martinez enter any information into the

10 computer, the testimony of Mr. Martinez was that he understood

11 there was a new payroll company coming in he believes he met

12 with Ms. Wright to set up on the payroll company.  He never

13 touched the computer, he didn't log into the computer, he

14 didn't type on the computer, the information that you've heard

15 from Ms. Cabrera ban that's necessary is all information that

16 Paramount has, his name, his Social Security number, his

17 address, they had him on payroll for years, if they needed his

18 direct deposit his I nine is in evidence when he first started

19 working.  His W four in evidence from when he first started

20 work, anything that needed to be done to put into the Is is

21 item could have been done but no one from owe cyst ace has

22 testified.  Ms. SRA*EUD was not testifying who was allegedly

23 the Spanish speaking bilingual person who was present for the

24 on boarding, Mr. Black, Ms. Wright, no one testifies *E

25 testified they saw Mr. Martinez do this.  The information

center header

1    clearly could have been done by anyone.

2            THE COURT:  Let me stop you right there.  Not

3    according to Ms. Cabrera ban.  She said that, first of all she

4    described in explicit detail how the process worked and the

5    employees would come in one by one and with the assistance of

6    herself and Ms. SRA*ED and this sort of general oversight of

7    Ms. Wright.  They would complete the process themselves.  Every

8    page had to be completed before you went to the next page and

9    if it was completed it could not be uncompleted it could not be

10   gone back into or redone or corrected or changed.

11           MR. KATZ:  There's no mechanism that requires that

12   specific person to do that.  If Ms. Wright for example put in

13   all Mr. Martinez's information, the system would accept it.

14           THE COURT:  So what you're saying your THAOEUR of

15   what happened here is that Ms. Wright for you had an

16   opportunity to cross examine -- you didn't ask her this.  Did

17   you ask letter whether she sat down at the computer using the

18   information she had filled out the form for Mr. Martinez

19   fraudulently and committed a crime really that would create a

20   forged document.  Maybe she did.  But you didn't even ask her

21   that.  She certainly didn't testify she did that.  What's the

22   evidence she did that.

23           MR. KATZ:  I'm not saying Ms. Wright did it.  I'm

24   saying dash TKAERB.

25           THE COURT:  You just did say that.

                Angela O'Donnell, RPR, 914-390-4025

center header

1          MR. KATZ:  I stayed for example she has the

2    information.  Paramount has the information.  Just as there's

3    no inform *E evidence.  There's no evidence that Mr. Martinez

4    did it other than the HRAOEUP THET I call everyone must have

5    done it because it got down.

6          THE COURT:  It's not a hypothetical.  The evidence

7    shows that's the way this was done and the process was fold in

8    this case.  Although you're correct no person testified

9    Martinez did this.  Obviously he didn't testify to that.  He

10   said he didn't do it.  No one else said he did it.  You know,

11   did anyone else notice the irony here that we're having this

12   discussion about whether a person signed a document an

13   important document and the reason we're having the discussion

14   is because it's an electronic signature which means there's no

15   handwritten or HRELGTS just KA*UL it a wet Cigna TPHAOUR.  It's

16   not technically wet.  Wet in the sense it was incorporated but

17   we have a whole bunch of other documents that have wet

18   signatures on he is we don't have a dispute about those.

19   Mr. PHR*R says yep that's mine.  Next one much yep, TPHAES

20   fine.  Welling because it's a signature and it's his.  Did

21   anyone in the great corporate world ever think about this and

22   say, you know, H-PL, these signatures are great they're so

23   efficient but particularly in this context where employees are

24   coming in one by one, waiting in the hallway, coming in one by

25   one, why not do it -- why wouldn't you do it in writing so as

center header

```
 1  to avoid this exact problem?  There's a stark contrast here
 2  between documents in evidence with handwritten signatures as to
 3  which it's obvious that Mr. Martinez signed them.  He says so.
 4  And then a document which is also in evidence that has his name
 5  on the bottom but it's not obvious that he signed it
 6  essentially that's what you're arguing it's not obvious because
 7  the signature is not on it.  It's is a E SPEUG since it's a E
 8  signature which requires someone to go into a computer and
 9  utilizing a client ID number and a pin number and Social
10  Security number and date of birth, the kinds of data that you
11  say correctly the employer already knew because he's already
12  working there.  They already have all that information, so it
13  could have been done by somebody else.  That's really -- your
14  theory of the case is my client says he didn't do it, that
15  doesn't really explain who did do it, so, there's three
16  possibilities.  One he did it and you're saying he didn't, two
17  is that somebody else did it but the problem is you don't have
18  any evidence of somebody else doing it.  I guess those are the
19  only two possibilities I thought there were three.  The point
20  is he SAEUT I didn't do it.  We know it was done because we
21  have it here it is right here in front of me Exhibit A.  The
22  problem that you have and the great iron near is we have all
23  these documents the vast majority of documents have a signature
24  on them where it's clear as a bell who signed it, no dispute
25  whatsoever and the one document that matters doesn't have a
```

Angela O'Donnell, RPR, 914-390-4025

center header

1   signature on it and that leaves you the opportunity to say,

2   well, my client says he didn't do it and I know everybody else

3   says this is the process, so forth and so on.  But no one

4   testified they saw Mr. Martinez do it.  Therefore he didn't do

5   it.  That's really your argument.  He says he didn't do it, no

6   one testified that he did do it, therefore he didn't do it.

7            MR. KATZ:  And there's an absence of any evidence of

8   a sign in that he signed into the room to the computer or an

9   absence of any sort of electronic receipt that he got the

10  document after, anything that would indicate that whatever

11  happened at some point soon after he signed it he went to the

12  computer or he got a copy of this right after or anything like

13  that.  The only electronic record of anything here is a piece

14  of paper with his typed name on it.

15           THE COURT:  That's a pretty good paper.  You said

16  there's nothing here.  Well, yes there is, there's a document

17  with his E signature on it.  That's the evidence.  That's

18  pretty good evidence.  Is it conclusive.  No it's not

19  conclusive.  That's why we're having a hearing if it was

20  conclusive we wouldn't even have an egger a.  I agree with you

21  so far of to say there's no evidence.  Of course there is, it's

22  right here.  I'm looking right at it.  It's not conclusive.

23           MR. KATZ:  To me there's TPHOEFD that he went to take

24  that computer.  There's evidence of we didn't object to it

25  going into evidence.  It's clearly there, it's a business

center header

1   record, but there's nothing.  And in order to say, you know he

2   went -- everyone had to go to a computer.  There's not even a

3   record of the other documents that allegedly were signed with

4   the emergency contact or before.  TPHROPB of those were shown.

5   Nothing showing it was emailed to him.  Nothing where he had to

6   sign to the computer or sign in to the room to go to the

7   computer.  You had two of the witnesses said they had were

8   essentially in the room the entire time of the on boarding,

9   Ms. Wright was in most of the time and Ms. Cabrera ban was

10   there she said the whole time and there's no recollection by

11   anyone that Mr. Martinez was even at a computer typing at any

12   point.  And you know, for *E in terms --

13        THE COURT:  Again you're wrong about that.  There is

14   evidence of that, it's Exhibit A.  But at the same time I agree

15   with you it's not conclusive evidence and there isn't the other

16   things you just described.  I'm push being back a little bit.

17   To say there's no evidence is not correct it's not true at all.

18        MR. KATZ:  I guess I'm clarifying, I'm meaning that

19   there's no evidence that Mr. Martinez personally went on to the

20   computer to create the account that created that document.

21        THE COURT:  Well, yes THRES because -GTS his E

22   signature.  One can infer from that.  Not conclusively.  I said

23   that now about five times.  One could infer from that well he

24   did it because his name is on it.  That would be some evidence

25   he did do it that he went on to the computer and did exactly

Angela O'Donnell, RPR, 914-390-4025

center header

1    that.  Maybe you have a slightly different argument.  Maybe you

2    would argue, well, there's some evidence that he did it did it

3    but there's certainly no evidence he read it or understood it

4    or new what the heck he was doing when he signed it.  You would

5    be right there isn't any such evidence.  Of course that doesn't

6    really matter because people are bound by the contracts they

7    sign otherwise our very way of life would disappear, I think.

8    That's maybe an overstatement, but you get it.  People they've

9    got to be responsible, green ups are responsible for what they

10   do.

11         So if I were to infer from this document, that, yup,

12   he signed it, especially in light of the testimony of these

13   other witnesses about the process, lacking the precise concrete

14   proof other than the document itself that he signed it, well,

15   then, you would lose in this situation, whether he read it or

16   understood it, that's really beside the point.

17         MR. KATZ:  I mean.

18         THE COURT:  A better argument might be and this might

19   explain why he doesn't remember doing it is he didn't read it.

20   He clicked yet yes yes yes he went back to work he's a working

21   guy he's got work to do and he didn't really care what it said.

22   Fine you W-PBT May to sign it where do I sign.  Fine.  If

23   that's what happened, which may be what happened he's out of

24   luck he's not out of luck, he can arbitrate his claim.  He

25   doesn't lose his right to arbitrate his claim.  The only person

center header

1   are arguably out of luck is you frank lying because now you

2   can't bring a class action and potentially reap the substantial

3   fees that 3450EUG9 be associated with that.  That's not my

4   problem.  I don't think Mr. Martinez is adversely impacted at

5   all if I ruled against him.  So he can't make his climbs here,

6   he can make them somewhere else, perfectly PHR-BGT for 24EU78.

7   What the forum.  Is it AAA or what is it.

8              MR. KATZ:  It doesn't say in there.

9              THE COURT:  What.

10             MR. KATZ:  It doesn't say on the agreement just says

11   arbitration.  I'm SKEG.

12             THE COURT:  Asking the lawyers if they wouldn't tell

13   me.

14             MR. KATZ:  We would probably have to agree to a

15   mutual rule.  Typically it's three, it doesn't mandate.

16             THE COURT:  What does it mandate.

17             MR. KATZ:  It doesn't mandate the number or forum.

18             THE COURT:  Want me to come arbitration, compel it

19   where.  If I want granted your motion what can exactly am I

20   compelling arbitration in the generic sense.

21             MR. KATZ:  No, your Honor the parties would agree to

22   the actual arbitrator.

23             THE COURT:  Where does it say that?

24             MS. WRIGHT:  No, it's not in the document.

25             THE COURT:  So why are you saying the parties would

center header

1   do that?.

2          MS. WRIGHT:  Because that's what typically occurs

3   in --

4          THE COURT:  Typically when they're typical you use

5   the word typical, typically the arbitration agreement will

6   spell out who the arbitrator or who the arbitration system is

7   or the services or who it is that's actually doing the

8   arbitrating as opposed to saying we agree to arbitrate.

9          MR. KATZ:  Your Honor, I can only tell you that in my

10  experience and I've done three in the last four months, none of

11  them have spelled out any of that information.

12         THE COURT:  Well, whatever?  We don't have toy

13  address that at this time.

14         MR. KATZ:  I have nothing further.

15         THE COURT:  I know I interrupted you, if there's

16  anything further you wanted to say, you're welcome to say it.

17  I don't want to cut you off.

18         MR. KATZ:  No, your Honor.

19         THE COURT:  Ms. Wright.  Would you like to say

20  anything.

21         MR. KATZ:  Sure, your Honor.  Just briefly.

22         What we have here is an employee who submitted a deck

23  KHRA RAEGS basically indicating that it was Susan who filled

24  out and submitted information for him and then admitted that he

25  didn't know if it in fact was her because he couldn't see what

center header

1   she was doing on the screen and claimed he didn't understand or

2   speak English even if he could have seen it.  We also have the

3   same employee saying, you know, there were forms that were

4   submitted that he wouldn't have understood, again, because of

5   his very limited English and he used this word in his

6   declaration very limited when enduring the questioning he's

7   understanding some of the questions I'm asking in English it's

8   clear he understood them.  He testified Susan did speak

9   Spanish, and in the declaration says she doesn't speak Spanish.

10  There's been so many inconsistencies in his submission that I

11  think it's fair to say that if you are making

12  misrepresentations in one area you would make it otherwise.

13          We also have witnesses.

14          THE COURT:  What's the misrepresentation exactly.

15          MR. KATZ:  I'm sorry.

16          THE COURT:  What misrepresentation are you referring

17  to.

18          MR. KATZ:  One of the main one in his declaration he

19  indicated that Ms. Wright spoke no Spanish whereas he testified

20  that she did.  And that was, you know, something that he then

21  direct *E corrected.  He also indicated that she filled out the

22  information for him and that they had no conversation but on

23  the stand we're hearing that they did have an exchange which at

24  one point he said it was half Spanish, half English.  I'm not

25  ensure what the exchange was at this point because my notes are

center header

1    all over the place given the changes.

2           What we do have our witnesses -RB not just from PC C

3    but from Oasis we havtar Lyn who outlined the way the process

4    worked.  There is no doubt that the on boarding documents for

5    Mr. Martinez are dated on the 26th, which is the day he claimed

6    he met with Susan and he also indicated that the Oasis folks

7    came at least a week or two earlier when we know for a fact

8    that was not the case, it's the 23 and the 26th that the on

9    boarding was done and that's the exact same day his documents

10   were splitted.  There's just been so many indone cyst ten cease

11   that he's presented that I'm not sure how you would parse

12   through what is accurate anymore in terms of what he's

13   alleging, and that's all I'd like to say on that.

14          THE COURT:  Okay, well thank you both very much.

15   Hold on just one second.

16          THE COURT:  Okay, I don't have any further questions

17   either.  I'll take this under advisement.  And as I said, I

18   already have the motion papers, so this is just part of the

19   motion, it's not everything but I expect to be able to resolve

20   this in the relatively near future and I'll issue a written

21   opinion then we see where we go from there.  Okay.  Anything

22   further?

23          MR. KATZ:  Nothing further, your Honor.  Thank you.

24          MR. KATZ:  Nothing further, thank you your Honor.

25          THE COURT:  Thankful all very much.  Have a good day.

Angela O'Donnell, RPR, 914-390-4025

center header

1           THE CLERK:  All rise this Court will be in recess.

2     (.

3           (Proceedings concluded).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25